MON–SHORE MANAGEMENT, INC.
and James P. Richie, Plaintiffs,

v.

FAMILY MEDIA, INC., et al.,
Defendants.

CHARANDON COMMUNICATIONS,
INC. and Donald L. Nagle,
Plaintiffs,

v.

FAMILY MEDIA, INC., et al.,
Defendants.

ERIN PUBLISHING COMPANY, INC.
and Alan Berg, Plaintiffs,

v.

FAMILY MEDIA, INC., et al.,
Defendants.

John E. McGRANE, Plaintiff,

v.

FAMILY MEDIA, INC., et al.,
Defendants.

Nos. 83 Civ. 2013–CLB, 83 Civ.
2014–CLB, 83 Civ. 5548–CLB
and 83 Civ. 5550–CLB.

United States District Court,
S.D. New York.

March 29, 1984.

John C. Lankenau, Lankenau, Kovner & Bickford, New York City, for plaintiffs.

Sheldon Horowitz, Martin S. Weber, Patricia A. Pallingayan, Dept. of Law, New York City, for intervenor State of N.Y.

Kenneth Laptine, Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, New York City, for defendants Family Media, Inc., 1001 Home/Decorating Ideas, Inc., Robert Riordan, Florence X. Geffen, and David B. Chase, as Executors of the Estate of Maxwell M. Geffen, and Kathleen Parmenter.

Edward B. Ryder, Hertz & Ryder, Farmingdale, N.Y., for defendants 1001 Home/Decorating Ideas Agency, Inc., Roy W. Titus, Robert G. Emmett and Eric H. Stiefling.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiffs in these related cases, residents of four states, including New York, were franchisees of one or more of the defendants, who allegedly entered into

business relationships with them between 1980 and 1982. The lawsuits arise under a variety of federal and state statutes, and also present common law claims. Jurisdiction is based on federal questions, diversity of citizenship and the doctrine of pendent jurisdiction. This memorandum will address the defendants' motions, pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss portions of the complaints.

Defendants Family Media, Inc. and 1001 Home/Decorating Ideas, Inc. publish a home improvement and decorating magazine entitled "1001 Home Ideas." Both defendant corporations are organized and have their principal place of business in New York. In 1980, these defendants, through their president, defendant James Riordan, entered into an agreement with defendant 1001 Home/Decorating Ideas Agency, Inc., pursuant to which the 1001 Agency was to market franchises to provide regional inserts for the magazine. Essentially, the franchises sold permitted the franchisee to develop a local insert for the national magazine and to sell advertising for the insert from which, it was anticipated, a profit would be earned. The terms of each franchise agreement gave the franchisee a non-exclusive license to use the name 1001 Home/Decorating Ideas in the promotion and sale of the magazine. Ostensibly in order to maintain quality control over regional inserts, defendants retained responsibility for supervising most aspects of production of each insert.

The plaintiffs in this case were all franchisees of the defendants for various regions throughout the United States who entered into their franchise agreements between October 1980 and August of 1982. Plaintiffs Mon-Shore Management, Inc. ("Mon-Shore") and James P. Richie, the principal officer and owner of Mon-Shore, were the franchisees for the Pittsburgh region who, on July 13, 1981, entered into a franchise agreement with defendant Emmett, on behalf of 1001 Agency. Plaintiffs Charandon Communications, Inc. ("Charandon") and Donald L. Nagle, its owner and principal officer, entered into a similar arrangement with the defendants for the San Francisco area. It is alleged that this was done through a franchise agreement executed in New York in December 1981. The Philadelphia area franchise, which included territories in both Pennsylvania and New Jersey, was offered to plaintiff John E. McGrane, a New Jersey resident. After discussions with defendants Emmett and Stiefling which took place in New York, concerning the nature and terms of the prospective franchise, McGrane was authorized, by agreement, to prepare the insert for the Philadelphia area in August 1982. Plaintiffs Erin Publishing Company ("Erin"), a New York corporation, and Alan Berg, a New York resident and owner of Erin, were awarded the franchise for the New York region in May, 1982.

Each of the complaints in this consolidated action enumerates the various disclosure documents defendants supplied to plaintiffs before they entered into the franchise agreements, including those prepared pursuant to the Federal Trade Commission Rules and the disclosure laws of California, as well as accountants' reports, promotional literature and various internal projections.

The complaints in these actions are based upon breach of contract, fraud and the defendants' failure to comply with state and federal disclosure requirements in extending franchise offers. Plaintiffs seek compensatory and punitive damages, as well as rescission of the franchise agreements.

All four complaints allege claims based on the defendants' failure to register a franchise prospectus under the registration and disclosure requirements of the New York Franchise Sales Act (GBL § 681, et seq.). In addition, claims are pleaded in each action based on one or more of the following: (1) violations of Federal Trade Commission Rules; (2) violations of the ubiquitous Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961, et seq. ("RICO"); (3) breach of contract; (4) fraud; and (5) violations of United States antitrust laws.

All of the defendants move, pursuant to Rule 12(b)(6), F.R.Civ.P. to dismiss the claims based on the New York Franchise Sales Act, and the RICO claims in the Mon-Shore and Charandon actions. In addition, several of the defendants move to dismiss the fraud and antitrust claims.

*The Constitutionality of the New York Franchise Sales Act*

During the past decade, increasing attention has been focused on franchise sales abuse, with the result that some 29 states have enacted laws dealing with the problem. Many of these statutes provide for franchise registration and disclosure requirements. Kaufmann, *Practice Commentary to Article 33*, p. 231 (McKinney's Supp.1982). Pursuant to the Federal Trade Commission's authority, federal regulations have been adopted as well, which provide for mandatory disclosure by franchise sellers of all important aspects, financial and otherwise, of a proposed franchise, when making offerings to prospective franchisees. 16 C.F.R. § 436. The Federal Trade Commission Rule explicitly does *not* preempt state regulations which provide for more stringent disclosure requirements than those set forth in the Rule. *Id.* at note 2.[1]

New York has adopted a Franchise Sales Act, which went into effect on January 1, 1981. It endorses a full disclosure approach to the regulation of franchises and is virtually identical to the FTC Rule in terms of the type of information that must be afforded prospective franchisees. It is more demanding than its federal counterpart, however, in that franchise prospectuses proposed for use must be submitted to and approved in advance by the Department of Law. (§ 683). The Act empowers the Department of Law to refuse to register a prospectus if a franchisor fails to comply with the provisions of the Act, if it determines that the offer or sale would be fraudulent, or if the franchisor's past activities or criminal record make it likely that his participation in the franchise would present an unreasonable risk to prospective franchisees. [§ 683(7)].

While the primary thrust of the Act is full disclosure, it does, as one commentator has noted, "forge ... a comprehensive legal structure to thwart, combat and rectify franchise sales abuse ...." Kaufmann, *Practice Commentary* at 233. Thus, among other things, it provides for a private cause of action for rescission, damages and attorneys' fees for franchisees who, as in this case, assert that they were injured by violations of the Act. (§ 691).

The Act purports to govern franchise offers made to out-of-state franchisees, in circumstances where, as in this case, an offer to sell originates, is extended, or is accepted in New York:

"(a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.

(b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to sell is accepted in this state when acceptance is communicated to the offeror from this state." G.B.L. § 681(12)(a), (b).

---

1. Note 2 of § 436 of the F.T.C. Rule provides: By taking action in this area, the Federal Trade Commission does not intend to annul, alter, or affect, or exempt any person subject to the provisions of this part from complying with the laws or regulations of any State, municipality, or other local government with respect to franchising practices, except to the extent that those laws or regulations are inconsistent with any provision of this part, and then only to the extent of the inconsistency. For the purposes of this part, a law or regulation of any State, municipality, or other local government is not inconsistent with this part if the protection such law or regulation affords any prospective franchisee is equal to or greater than that provided by this part. Examples of provisions which provide protection equal to or greater than that provided by this part include laws or regulations which require more complete record keeping by the franchisor or the disclosure of more complete information to the franchisee.

Maintaining that because of this extra-territorial application the New York Franchise Sales Act directly and excessively burdens interstate commerce, defendants challenge its validity under the commerce clause of the United States Constitution.

■■■■ The commerce clause provides that "Congress shall have Power ... [t]o regulate commerce ... among the several states." U.S. Const., Art. 1, § 8, cl. 3. While this provision acts as a limitation upon the power of the states even in the absence of implementing Congressional legislation, *Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1852), a state statute which impacts upon interstate commerce will now be upheld so long as it "regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Such regulations may be incidental only; direct regulation of interstate commerce by the states is forbidden. *Id.; Shafer v. Farmers Grain Co.*, 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925).

Defendants maintain that the New York Franchise Sales Law, insofar as it governs the offer and sale of franchises to out-of-state parties, constitutes both a direct and excessive burden on interstate commerce. In making this argument, defendants rely primarily on *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), in which the Supreme Court held an Illinois act which regulated take-over offers unconstitutional on federal supremacy and commerce clause grounds. The Illinois Take-Over Act required that any tender offer for the shares of a target company be registered with the Illinois Secretary of State if shareholders located in Illinois constituted at least 10% of the class of shares subject to the offer, or if two of the following conditions were found to exist: (1) the target company's executive office was located in Illinois; (2) the company was organized under the laws of Illinois; (3) the company had at least 10% of its stated capital within the state. If these conditions were present, the Illinois Secretary of State was empowered to review the offer, rule upon its substantive fairness and deny registration if he found that it was inequitable.

In addition to finding that the Take-Over Act was pre-empted by federal legislation, [the Williams Act, 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f)], an objection which cannot be made to the New York Franchise Sales Act, the court invalidated the act on commerce clause grounds as well. The court observed that on its face, the Take-Over Act could be applied to regulate tender offers which would affect no Illinois shareholders, and stated that in view of its "sweeping extra-territorial effect," it constituted a direct restraint on interstate commerce: "The Commerce Clause ... precludes the application of a state statute to commerce that takes place *wholly outside* of the State's borders, whether or not the commerce has effects within the State." *Id.* at 642–43, 102 S.Ct. at 2641 (emphasis added).

The majority held the act invalid under the *Pike v. Bruce Church* test, quoted above, and reasoned that while Illinois had a legitimate interest in protecting its shareholders, it had no such interest in protecting only non-resident shareholders. The court concluded that "insofar as Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." *Id.* at 644, 102 S.Ct. at 2642.

Defendants argue that the Franchise Sales Act is similarly infirm in that it gives New York authority over franchise transactions which take place outside of the state. While superficially appealing, the analogy between the Illinois Take-Over Act and New York's franchise regulation is inapposite. The Franchise Sales Act, unlike the statute at issue in *Mite*, does not apply to commerce that takes place "wholly outside" of New York, nor may it be applied to invalidate transactions having no connection with this State. Quite to the contrary,

the scope of the Franchise Sales Act is significantly narrower, and its disclosure requirements become operative only when an important aspect of a particular franchise transaction—an offer to sell or buy, or actual sale—occurs in the state, or the franchise will operate in the state, or the franchisee resides here. Under the terms of the statute in *Mite*, a nationwide tender offer could have been held in abeyance or have been permanently thwarted by Illinois even if none of its resident shareholders had been affected thereby. Here, in contrast, the state regulation is applicable only to specific transactions solicited or accepted in New York, or affecting New York. The New York statute cannot have any effect whatsoever on the nationwide marketing of franchises if the franchisor elects to conduct his activities outside of this State and with non-residents.

The New York Franchise Sales Act, as noted above, is not pre-empted by federal legislation, nor can it be argued, as was the case in *Mite*, where the Illinois Take-Over Act was found to frustrate the objectives of the Williams Act, 457 U.S. 632–39, 102 S.Ct. at 2636–39, that the Franchise Sales Act somehow "frustrates the objectives of [Congressional legislation] in some substantial way." *Id.* at 632, 102 S.Ct. at 2636. Significantly, the Supreme Court found that the Take-Over Act conflicted with the Williams Act because it gave the Illinois Secretary of State ability to assess and pass on the *substantive* fairness of a tender offer, whereas Congress, in enacting the Williams Act, had intended only to "make the relevant facts known so that shareholders have a fair opportunity to make their decisions," H.R.Rep. No. 1711, 90th Cong.2d Sess., 4 (1968), quoted *id.* at 639, 102 S.Ct. at 2639, that is, to provide for full disclosure. Here, in contrast, the Franchise Sales Act does not provide any substantive restrictions on the franchisor-franchisee relationship; as a full disclosure requirement very similar to those required by the FTC, the Franchise Sales Act complements federal requirements. In short, there are a host of fundamental differences between the statute challenged in *Mite* and

the one at issue in the instant case, and this Court declines to extend the *Mite* holding to the circumstances of this case.

Returning to the principles governing state legislation affecting interstate commerce, as set forth by the Supreme Court in *Pike v. Bruce Church, supra*, it is clear that the Franchise Sales Act is a valid exercise of state authority. The Franchise Sales Act is one of general application which does not discriminate against interstate commerce. As reflected in the location of the plaintiffs and defendants in this case, it governs franchise transactions under certain circumstances regardless of whether franchise offers are extended within New York or some other state. The same statutory requirements are applicable in both situations and thus regulate in an evenhanded fashion. *Huron Cement Co. v. Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

The Franchise Sales Act serves legitimate state interests. As stated in the legislative findings, New York has a valid interest in protecting prospective franchisees from unscrupulous franchisors. The protection of investors is without question a legitimate state objective, *e.g.*, *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). More specifically, full disclosure regulations, like the Franchise Sales Act, "which require that buyers and sellers provide each other with accurate information about their products and services in order to counteract deceptive practices are based on legitimate state interests." *Allied Artists Pictures Corp. v. Rhodes*, 679 F.2d 656, 661 (6th Cir.1982). In enacting the Franchise Sales Act, the Legislature did not attempt to protect only residents of this State, but extended the Act's protection to franchisees in other states as well, where offer and/or acceptance took place here, thereby helping to protect and enhance the commercial reputation of the State which, in and of itself, is a legitimate and substantial state interest. *Pike, supra*, 397 U.S. at 143, 90 S.Ct. at 848.

We must next determine whether the burdens imposed on interstate commerce by the Franchise Sales Act are "clearly excessive" compared with the benefits that inure to the legitimate state interests served by the statute. As mentioned above, the regulation at issue merely requires full disclosure, and is designed to prohibit fraud. The benefits of such regulations are obvious. Full disclosure requirements are a familiar and common regulatory technique employed by both the federal and state governments. *See, e.g., Allied Artists, supra; Century 21 Real Estate Corp. v. Nevada Real Estate Advisory Comm.*, 448 F.Supp. 1237 (D. Nevada), *aff'd.*, 440 U.S. 941, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979). Full disclosure requirements have been viewed as necessary to the proper functioning of a free economy, and legislation which provides for greater disclosure requirements are regarded as necessary in preventing fraud. *Century 21 Real Estate, supra.*

Defendants contend that the Franchise Sales Act places too great a burden on interstate franchise transactions. Noting that the Act's disclosure and enforcement provisions are more stringent than those required in other states (*see* Kaufmann, *supra*, at 231), they contend that its detailed disclosure and record keeping requirements place an "onerous" burden on franchisors. In particular, they complain of having to comply with a multiplicity of registration requirements, both federal and state, if franchisees are sought in more than one state. Defendants exaggerate the additional burden of complying with the New York requirements. The Franchise Sales Act specifically permits a franchise offeror to use "any uniform disclosure document approved for use by any agency of the federal government or sister state" in lieu of the New York disclosure document, "provided that said uniform disclosure documents comply with the [New York] provisions." § 683(1). Thus, a franchisor may use the FTC format, the Uniform Franchise Offering Circular (U.F.O.C.), developed by the Midwest Securities Commission to facilitate compliance among franchisors operating in several states, or the New York format. While New York's registration provisions require information not required by the other authorities, the additional information may be supplied in an addendum. 13 N.Y.C.R.R. § 200.4(d).

Additionally, franchisors who feel that a decision to deny registration of their franchises was invalid under the Franchise Sales Act, or in some way arbitrary and capricious, may bring an Article 78 proceeding against the Attorney General to vacate that determination. *Lee Myles Associates Corp., et al. v. Abrams*, 117 Misc.2d 919, 455 N.Y.S.2d 983 (Sup.Ct.N.Y. Co.1982). In that case the court held that a franchise registration constitutes a "property right" to which the normal complement of due process rights attach, including the opportunity to be heard before registration is denied.

In the situations regulated by New York State, either the offeror or offeree will presumably be engaged or intending to engage in business in New York, and in those circumstances it is surely not too onerous a burden to require the offering to comply with New York's requirements.

In considering the extent of the burden imposed on interstate commerce by the New York Act, we must keep in mind that the Federal Trade Commission has encouraged more stringent state franchise regulations, 16 C.F.R. § 436. In providing that a franchise broker could satisfy federal requirements by complying with a state registration requirement having stricter rules, the FTC stated:

"The Commission believes that it is possible for state and local governments to enact franchise measures which provide for greater protection, either because these governments are able to allocate greater resources to enforcement efforts in this area or because their governments might uncover problems and devise solutions which are unknown at this time." 43 Fed.Reg. 59614, 59721 (1978).

█ Finally, it should be noted that New York's interest in maintaining the integrity

of franchise transactions is analogous to its regulatory interest in the offer and sale of securities. A state can, of course, constitutionally regulate an offer of securities communicated *into* its territory [*e.g., Underhill Associates v. Bradshaw,* 674 F.2d 293 (4th Cir.1982) ].

In conclusion, this Court declines to find that the New York Franchise Sales Act, as applied here, constitutes an impermissible burden on interstate commerce. Because of this conclusion, the Court need not address whether the challenged portions of the Franchise Sales Act are severable from the remainder of the statute.

*Choice of Law—Application of New York Franchise Sales Act*

Defendants assert that conflict of laws principles preclude the application of the Franchise Sales Act in the *Mon-Shore, McGrane* and *Charandon* actions. Essentially, defendants argue that New Jersey, Pennsylvania and California, as the sites of the franchises in three of these actions, have a greater interest in applying their law to the cases than does New York. We need not address this "grouping of contracts" argument, for the franchise agreements in each of these cases have a choice of law provision which states:

> "This agreement shall be deemed made in the state of New York and all rights and obligations of the parties hereunder shall be governed as to validity, construction, and in all other respects by the law of New York."

This provision is sufficient, without more, for New York's Franchise Sales Act to be applied in this litigation. Under New York's conflict of laws doctrine, which we are required to apply in this case, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), New York will honor a provision in an agreement stipulating that the law of a particular jurisdiction will govern the relations between the parties. *Freedman v. Chemical Construction Corp.,* 43 N.Y.2d 260, 265, 401 N.Y.S.2d 176, 179, 372 N.E.2d 12, 15 (1971); *C.B.S. Inc. v. Tucker,* 412 F.Supp. 1222, 1226, n. 5 (S.D.N.Y.1976).

Absent a choice of law clause we believe a New York court would apply New York law in light of the clearly expressed intention of the New York Legislature to exert its fullest power over franchises offered or accepted within its police jurisdiction.

*Motion to Dismiss the Antitrust Claims*

Defendants 1001 Agency, Titus, Emmett and Stiefling move to dismiss the plaintiffs' antitrust claims, which are based upon the allegation that the franchise agreements constituted an illegal tying arrangement prohibited by 15 U.S.C. § 1. Plaintiffs contend that the license to use the trademark or trade name "1001 Home/Decorating Ideas," which was extended to them under the terms of the franchise agreements, constituted the tying product, while the services which plaintiffs were required to purchase from defendants comprised the tied products. The services which the agreement stipulated would be furnished by defendants to plaintiffs included: layout and typesetting; printing; production, insertion and binding; labeling and mailing; and ultimately, circulation and distribution of the magazine and supplements. The complaints allege that the violations affected interstate commerce, and proximately caused damage to the plaintiffs.

The moving defendants claim that the antitrust claims should be dismissed because the complaints do not allege that the plaintiffs had sufficient power to affect interstate commerce or to stifle competition. In addition, they contend that the services enumerated in the agreement did not constitute a tying arrangement, but represented the publisher's legitimate effort to supervise the creation of the inserts in such a manner as to preserve the magazine's reputation.

This aspect of the motions will be held in abeyance so as to permit counsel for the parties to consider the effect, if any, on these claims, of the recent Supreme Court decision in *Jefferson Parish Hospital v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2, 1984.

*RICO Claims*

■ Several of the complaints allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., against defendants Family Media, 1001, Inc., 1001 Agency, Riordan, Steifling and Emmett. Plaintiffs maintain that defendants' actions pertaining to the offer of franchises were in violation of the mail fraud statutes, 18 U.S.C. §§ 1341, et seq., and thus constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and § 1961(5).

The defendants so named move to dismiss the RICO cause of action asserted in one or more of the complaints.

In recent years, the assertion of RICO claims in civil damage actions has become increasingly popular, due to, among other things, its provisions for treble damages and legal fees, as well as the ease with which a plaintiff can establish the predicate pattern of racketeering activity. *See generally,* Bridges, Private RICO Litigation Based upon "Fraud in the Sale of Securities," 18 *Georgia L.Rev.* 43 (1983). In addition to the express benefits afforded civil plaintiffs in the RICO statute, the statute gives them a less tangible, but perhaps more important "collateral advantage":

"Plaintiffs can boost the settlement value of a case by including a RICO claim because RICO gives them a tool for intimidation. Having alleged an arguable case for a RICO violation, a plaintiff can smear a defendant with [organized crime] associations. Additionally, press releases that allege racketeering activity by a defendant are more likely to grab headlines than those that announce usual commercial or securities litigation." *Id.* at 46–47 (footnotes omitted).

One way in which courts have attempted to limit the potentially Draconian scope of civil liability under the RICO statute is by requiring that some allegation of organized criminal activity accompany a complaint based on the civil provisions of RICO. *See Minpeco, S.A. v. Conticommodity Services, Inc.,* 558 F.Supp. 1348 (S.D.N.Y.1983); *Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347, 1361 (S.D.N.Y.1983), *aff'd. on other grounds,* 719 F.2d 5 (2d Cir.1983).

Such a requirement has been viewed as justified in light of the overriding Congressional objective in enacting the RICO statute, which, according to the Supreme Court, was to eradicate organized crime. *United States v. Turkette,* 452 U.S. 576, 589, 101 S.Ct. 2524, 2531–32, 69 L.Ed.2d 246 (1981), quoted in *Minpeco, supra,* 558 F.Supp. at 1350. In two recent decisions, Judges in this district have rejected the notion that a claim of mail fraud would suffice to establish a RICO violation absent some allegation of organized criminal activity:

"[T]here is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties. For example, it was clearly established at the time that RICO was enacted that there was no private right of action for violations of the mail fraud statute. It is implausible that Congress could have meant to alter this accepted rule to the extent of creating a right of action for treble damages without a single mention of such a revolutionary consequence anywhere in the legislative history." *Moss v. Morgan Stanley, supra,* 553 F.Supp. at 1361; *see also Minpeco, supra,* 558 F.Supp. at 1350–51.

In *Moss v. Morgan Stanley,* while affirming the district court, the Court of Appeals seemed to reject by *dicta,* the theory that a link to organized criminal activity is a necessary prerequisite to RICO damage claims. 719 F.2d at 21. In its most recent expression on the subject, however, that Court indicated that this issue is unresolved, and suggested that it might be appropriate to limit RICO civil damage claims to actions based upon criminal activities in which convictions have been obtained. In *Trane Co. v. O'Connor Securities,* 718 F.2d 26 (2d Cir.1983), a civil action for securities fraud, the Court noted that "a growing number of courts have held that

private civil RICO actions cannot be used to turn garden variety securities law violations into RICO claims." *Id.* at 28, n. 3. The Court concluded:

"[W]e ... leave to another day the remaining substantive RICO issue, whether the reference, in 18 U.S.C. § 1961(1)(D), defining 'racketeering activity' to include 'any offense involving ... fraud in the sale of securities ... punishable under any law of the United States,' which obviously refers to criminal punishment, requires that to be considered as predicates for civil RICO purposes there must have been securities law *convictions* ...." *Id.* at 29. (Emphasis in original).

In view of the long history in this Circuit of predicating RICO damage actions on some tie to organized criminal activity, and having in mind the Court of Appeals' suggestion that this question is yet to be decided, this Court grants defendants' motions to dismiss those portions of the complaints based on RICO.

■ The remaining arguments of which defendants' motions to dismiss are based need not be discussed at length. The 1001 Agency defendants argue that the parol evidence rule bars proof of omissions from the prospectus, since the prospectus was part of the integrated franchise contract. However, the parol evidence rule cannot be used to frustrate the policy of the statute.

■ It is also argued that punitive damages and damages for emotional distress may not be awarded in a contract action. The Court recognizes that this is true as to the contract claims, as to which the plaintiffs have withdrawn these damage claims (Plaintiffs' Memorandum in the *Erin* action, p. 40), but notes that such damages may properly be sought in the fraud actions.

*Conclusion*

The motions to dismiss the RICO claims are granted. The motions to dismiss all other claims are denied, except as to the antitrust claims, as to which decision is deferred.

Since pronouncements in the case law on the subject of RICO presently diverge, and further appellate pronouncements in the area appear imminent, the Court concludes that the parties are entitled to have a final judgment at this time so plaintiffs may seek appellate review if they disagree with our foregoing analysis. Accordingly, this Court finds that there is no just cause for delay. See Rule 54(b), F.R.Civ.P. Settle partial final judgments on three days notice which shall dismiss only those claims against all defendants based on the Racketeer Influenced and Corrupt Organizations Act.

So Ordered.