854 F.2d 18
 RETAIL SOFTWARE SERVICES, INC., Plaintiff-Appellant,
v.
Hal LASHLEE, Jill Weissman, as Special Administrator of the
Estate of George Tate, Glenn Johnson, William Janeski, Jay
Sargeant, Robert Fick, Jamie James, Raphael Cristy and
Investment Marketing Associates, Inc., Defendants,
William Janeski and Robert Fick, Defendants-Appellees.
 No. 323, Docket 87-7524.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 12, 1988.
Decided Aug. 10, 1988.
 
 Andre R. Jaglom, New York City (Stecher Jaglom & Prutzman, Jamie B.W. Stecher, Josiah Greenberg, of counsel), for plaintiff-appellant.
 William L. Janeski, Washington, D.C., pro se.
 Before KAUFMAN, CARDAMONE and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 This is an appeal from a Fed.R.Civ.P. 54(b) judgment of the United States District Court for the Eastern District of New York, Joseph M. McLaughlin, Judge, granting motions by three of the individual defendants to dismiss for lack of personal jurisdiction. The plaintiff, a New York corporation, had asserted claims of common-law fraud, breach of fiduciary duty, and violations of civil RICO and of New York's Franchise Sales Act, N.Y.Gen.Bus.Law Secs. 680 et seq. (McKinney 1984) ("FSA"). We recite the plaintiff's version of the facts, which we take to be true for the purposes of review.
 
 
 2
 Plaintiff Retail Software Services ("Retail") is a New York corporation. Softwaire Centre International ("SCI"), now bankrupt, was a California franchisor of retail microcomputer software stores. SCI was formed in 1981 by the late George Tate, who was well known in the computer field and whose estate was one of the moving defendants below, along with two other defendants who were not involved in the proceeding that led to this appeal.
 
 
 3
 SCI transacted business in New York by registering and soliciting franchise sales here and by conducting franchise negotiations with Retail here. In 1984 Retail purchased from SCI in New York seven franchises that were to operate in Manhattan and on Long Island. Retail paid $187,000 in deposits and incurred substantial additional expenses before SCI went bankrupt a few months later, without performing under the agreement.
 
 
 4
 Retail brought this action in the district court against various individuals and a corporation associated with the bankrupt SCI. The claims that are relevant to this appeal were advanced under the FSA. Retail alleged that it had purchased the franchises in reliance on a series of misrepresentations and omissions that were made in violation of the FSA by SCI and the defendants.
 
 
 5
 The three individual defendants who moved in the district court to dismiss for lack of personal jurisdiction are: Robert Fick, who was SCI's vice president for finance and chief financial officer and who owned .7% of SCI's stock; William Janeski, who was president and chief executive officer of SCI as well as a director and 4.6% shareholder; and the estate of George Tate, who had been a director, 31.55% shareholder, vice-president, and secretary of SCI. Fick and Janeski are alleged to have made, at a California meeting with Retail, misrepresentations about SCI's financial condition, the nature of Tate's involvement with the venture, and the extent to which SCI would provide training facilities in New York. Janeski is alleged to be responsible for misleading financial statements, for a misleading offering prospectus that was part of the franchise registration that was filed in New York, and for the advertising of franchise sales in New York. In addition, while negotiating by telephone with Retail's president in New York, Janeski made misleading representations and omitted material, negative information about SCI's financial condition. Fick is alleged to have withheld crucial information about SCI's financial condition, while personally misrepresenting material facts in order to persuade Retail to purchase the franchises. Tate is alleged to have allowed the other defendants to misrepresent the extent of his involvement with SCI franchises. Retail also claims that SCI caused its franchisees, including Retail, to purchase obsolete goods from one of Tate's other companies. All of the defendants are alleged to have acted with intent to defraud Retail.
 
 
 6
 Retail asserts two bases for personal jurisdiction over the moving defendants: New York's Franchise Sales Act itself, and New York's long-arm statute, N.Y.Civ.Prac.Laws & Rules Sec. 302(a)(1), (2) and (3) (McKinney 1972 & Supp. 1988).
 
 
 7
 Although the FSA provides a method for service of process on nonresident defendants, see N.Y.Gen.Bus.Law Sec. 686, the district court held that the act does not provide a basis for personal jurisdiction over nonresident officers and directors of a corporation that sold franchises in New York. Furthermore, the district court concluded that "to subject an individual to the jurisdiction of the New York courts simply because he is in some way affiliated with a company engaged in franchise sales here would offend 'traditional notions of fair play and substantial justice,' International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)."
 
 
 8
 As to possible long-arm jurisdiction under N.Y.Civ.Prac.Laws & Rules Sec. 302, the district court rejected the notion that officers or directors can be deemed to have acted through their corporation in transacting business or causing a tort within the state. In rejecting Retail's Sec. 302 argument, the district court disapproved, but nevertheless relied upon, the fiduciary shield doctrine.
 
 
 9
 Before oral argument of this appeal, Retail settled with the estate of George Tate, so we concern ourselves only with the claims against Fick and Janeski. Fick did not file a brief or argue in this appeal, and Janeski filed, pro se, a two-page brief asserting that "traditional notions of fair play and substantial justice would be offended by the exercise of personal jurisdiction" over him.
 
 
 10
 Because we conclude that personal jurisdiction over Fick and Janeski may be exercised pursuant to New York's long-arm statute without violating the requirements of due process, we reverse.
 
 
 11
 I. Background: The Franchise Sales Act.
 
 
 12
 Although it is not necessary for us to reach the issue of whether the FSA itself creates a basis for the exercise of personal jurisdiction over these defendants, a description of the purposes and provisions of the act is helpful to an understanding of the circumstances surrounding this case. In response to widespread abuse of the franchise sales system that has accompanied rapid expansion of the franchising market in the past 20 years, the New York legislature joined the majority of other states and adopted legislation, the FSA, designed to prevent abuses in the sales of franchises. N.Y.Gen.Bus.Law Secs. 680 et seq. (McKinney 1984); see Mon-Share Management, Inc. v. Family Media, Inc., 584 F.Supp. 186, 189 (S.D.N.Y. 1984); Kaufmann, Practice Commentary to Article 33, at 587-88 (McKinney 1984); New York State Legislative Annual 1980, at 286-87 (Memorandum of Senator James J. Lack). The FSA is a comprehensive statutory scheme that attempts both to prevent franchise sales abuse--by requiring presale disclosure through a registered prospectus--and to remedy such abuse through post-sale monitoring, investigation, civil and criminal prosecutions, and private civil actions. Mon-Share, 584 F.Supp. at 189; State of New York v. Danny's Franchise Systems, Inc., 131 A.D.2d 746, 747, 517 N.Y.S.2d 157, 158-59 (2d Dep't 1987); Practice Commentary at 590-93. See N.Y.Gen.Bus.Law Sec. 680.2.
 
 
 13
 Section 691.3 of the act dissolves the corporate veil by making corporate officers and directors jointly and severally liable under the FSA if they "materially aid[ ] in the act [or] transaction constituting the violation." N.Y.Gen.Bus.Law Sec. 691.3. Section 686 provides for designation of the secretary of state as an agent for service of process directed to (among others) corporate directors and officers of any corporation that sells or offers to sell a franchise in New York.
 
 
 14
 Retail argues that the statutory designation of an agent in New York to receive process directed to nonresident defendants, when read in conjunction with Sec. 691, indicates that the legislature intended to create a basis for jurisdiction as well as a method of service on nonresident defendants. We gave the New York Court of Appeals the opportunity to resolve this question of state law, but they declined. See Retail Software Services, Inc. v. Lashlee, 838 F.2d 661 (2d Cir.1988); Retail Software Services, Inc. v. Lashlee, 71 N.Y.2d 788, 530 N.Y.S.2d 91, 525 N.E.2d 737 (1988).
 
 
 15
 We need not reach the merits of Retail's jurisdictional argument under the FSA however, because a recent decision of the New York Court of Appeals interpreting New York's long-arm statute indicates that a more than adequate basis exists in this case for the exercise of personal jurisdiction under N.Y.Civ.Prac.Laws & Rules Sec. 302(a)(1).
 
 
 16
 II. Jurisdiction under New York's Long-Arm Statute.
 
 
 17
 Retail argues that personal jurisdiction may be exercised over the defendants under New York's long-arm statute, N.Y.Civ.Prac.Laws & Rules Sec. 302, which applies to a cause of action that arises from acts enumerated within the section, and which reaches (1) a nondomiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state", Sec. 302(a)(1); (2) a nondomiciliary who commits a tortious act within the state, Sec. 302(a)(2); and (3) a nondomiciliary who commits a tort outside the state that causes injury within the state if the defendant (i) does business in or derives substantial revenue from the state or (ii) expects or reasonably should expect the act to produce consequences in the state and derives substantial revenue from interstate commerce, Sec. 302(a)(3).
 
 
 18
 The district court rejected Retail's argument for jurisdiction under this "long-arm" statute. It found that a corporation cannot be deemed to be the agent of its directors and officers for the purposes of Sec. 302. It further believed that under New York law the fiduciary shield doctrine, which shields a corporate employee from the exercise of personal jurisdiction over him if he acted solely in a corporate capacity within the forum state, see CPC Internat'l, Inc. v. McKesson Corp., 70 N.Y.2d 268, 287-88, 519 N.Y.S.2d 804, 814, 514 N.E.2d 116 (1987), would preclude the exercise of jurisdiction over a corporate employee who acted outside the state in a corporate capacity.
 
 
 19
 After the district court's decision in this case, however, the New York Court of Appeals decided Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988), which held that the fiduciary shield doctrine does not apply to any of the provisions of New York's long-arm statute. Id. at 472, 527 N.Y.S.2d at 202, 522 N.E.2d at 47. See CPC Internat'l, Inc. v. McKesson Corp., 70 N.Y.2d at 288, 519 N.Y.S.2d at 814, 514 N.E.2d at 126 (fiduciary shield doctrine does not apply when long-arm jurisdiction is predicated on defendant's commission of tortious act within the state).
 
 
 20
 Kreutter has even greater significance for this appeal. There, the court held that an individual defendant (Downman, a corporate officer of McFadden Oil Corporation, a Texas corporation) and a corporate defendant (Harmony Drilling Co., a Texas corporation) transacted business in New York within the meaning of Sec. 302(a)(1), through an agent, McFadden Company, a Texas corporation that was licensed to do business in New York and had its principal place of business in New York. Id. 71 N.Y.2d at 463, 527 N.Y.S.2d at 196, 522 N.E.2d at 41. The court held that personal jurisdiction could be exercised over Downman and Harmony under Sec. 302(a)(1), and explained:
 
 
 21
 In this case, plaintiff did not deal directly with McFadden Oil, Harmony or Downman. He dealt with McFadden Company in New York, and the question is whether McFadden Company was acting as the agent of the Texas defendants so that its actions are attributable to them and support New York's assertion of jurisdiction over them. Plaintiff need not establish a formal agency relationship between defendants and McFadden Company. He need only convince the court that McFadden Company engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the Texas defendants and that they exercised some control over McFadden Company in the matter.
 
 
 22
 Id. at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 44 (citations omitted). Kreutter thus resolves the issue of whether a corporation can act as an agent for an individual for the purposes of Sec. 302(a)(1).
 
 
 23
 In this case, SCI engaged in purposeful activities in the state (selling franchises) with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over SCI in the transaction underlying this suit. Fick and Janeski, like Downman, are "primary actor[s] in the transaction in New York" that is the source of this litigation, and are not "some corporate employee[s] in [California] who played no part in" the franchise sale. 71 N.Y.2d at 470, 527 N.Y.S.2d at 201, 522 N.E.2d at 45. Because Kreutter establishes that New York intends its long-arm statute to reach precisely the type of behavior alleged in this complaint, we must now consider whether due process allows New York to do so.
 
 
 24
 III. Due Process.
 
 
 25
 We find that the exercise of personal jurisdiction over Fick and Janeski comports with the "traditional notions of fair play and substantial justice" embodied in the due process clause of the fourteenth amendment. McGee v. Internat'l Life Ins. Co., 355 U.S. 220, 222, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) (citing Internat'l Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Before a court can render a valid personal judgment against a nonresident defendant, the due process clause requires that the defendant receive adequate notice through valid service of process, and be subject to personal jurisdiction. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) (citations omitted). See Soltex Polymer Corp. v. Fortex Industries, Inc., 590 F.Supp. 1453, 1456 (E.D.N.Y.1984), aff'd, 832 F.2d 1325 (2d Cir.1987). In this case, New York's long-arm statute provides the basis for the exercise of jurisdiction, and service was made in compliance with Fed.R.Civ.P. 4 and Article 3 of New York's CPLR.
 
 
 26
 The exercise of personal jurisdiction comports with the requirements of due process, however, only if "minimum contacts exist between the defendant and the forum state." World-Wide Volkswagen, 444 U.S. at 291, 100 S.Ct. at 564; McGee, 355 U.S. at 222, 78 S.Ct. at 201; Internat'l Shoe, 326 U.S. at 316, 66 S.Ct. at 158. The concept of minimum contacts performs two functions: achieving fairness and preserving federalism. World-Wide Volkswagen, 444 U.S. at 291, 100 S.Ct. at 564. The fairness function protects defendants from the burdens of litigating in a distant forum; the federalism function "ensure[s] that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." Id. at 292, 100 S.Ct. at 564.
 
 
 27
 A number of cases provide guidance as to what kinds of contacts the Supreme Court considers sufficient to meet the "minimum contacts" standard. In Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court held that the exercise of jurisdiction by a Florida court, pursuant to Florida's long-arm statute, over a Michigan franchisee in a suit for breach of contract brought by a Florida franchisor, did not offend the "traditional conception[s] of fair play and substantial justice" embodied in the due process clause. Id. at 464, 487, 105 S.Ct. at 2177-78, 2190 (citation omitted). Although the defendant mailed payments to Florida and the contract contained a Florida choice of law provision, id. at 480-81, 105 S.Ct. at 2186-87, he had never physically entered the forum state, did business only in Michigan, and his principal contacts with the plaintiff had been through the plaintiff's Michigan office. Id. at 487, 105 S.Ct. at 2190-91 (Stevens, J., dissenting). The Court nevertheless concluded that the franchise dispute grew directly out of a " 'contract which had a substantial connection with' " Florida, id. at 479, 105 S.Ct. at 2186 (quoting McGee v. Internat'l Life Ins. Co., 355 U.S. at 223, 78 S.Ct. at 201 (emphasis added)), and that the defendant had reached into Florida to purchase a long-term franchise and to obtain the benefits of affiliation with a nationwide organization. Id. 471 U.S. at 479-80, 105 S.Ct. at 2186. The Court rejected the argument that the disparity in bargaining power and financial capacity made it unfair to subject the defendant to litigation in a distant forum. See id. at 488-90, 105 S.Ct. at 2190-91 (Stevens, J., dissenting).
 
 
 28
 The defendants in this case have greater contacts with New York than the Burger King defendant did with Florida; furthermore, the equities weigh even more heavily on the side of the plaintiffs in this case. Fick and Janeski, through SCI, reached into New York to obtain the benefits of selling seven franchises to be operated in the state. As officers, directors, and shareholders, they stood to benefit from this entry into the New York market. They had received explicit notice, through the FSA, that they would be individually liable in any suit arising under the act. Furthermore, unlike Burger King, this is not a case where an individual defendant who is unaffiliated with a corporation is being haled into court by a large multinational corporation.
 
 
 29
 Other Supreme Court cases support our conclusion. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773-74, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (defendant's circulation of magazines in forum state sufficient to support exercise of jurisdiction in libel action); Calder v. Jones, 465 U.S. 783, 789, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (reporter and editor of Florida newspaper subject to California jurisdiction in libel action "based on 'effects' of their Florida conduct in California") (citations omitted). In Calder, the Court rejected the argument that World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), forbids the exercise of jurisdiction over employees who, although they may foresee the effect of their actions, "have no direct economic stake in their employer's sales in a distant State." Id. 465 U.S. at 789, 104 S.Ct. at 1487. The Court emphasized that
 
 
 30
 [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in this State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.
 
 
 31
 Id. at 789-90, 104 S.Ct. at 1487 (citations omitted). Our situation is even more persuasive because the defendants in this case, unlike the defendants in Calder, cannot claim to "have no direct economic stake in their employer's sales", id. at 789, 104 S.Ct. at 1487, in New York.
 
 
 32
 Finally, New York's interest in providing a forum for its citizens who have been injured by the intentional acts of nonresidents is a factor that may properly be considered in a due process analysis. Compare McGee, 355 U.S. at 223, 78 S.Ct. at 201 ("[i]t cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable.") with Shaffer v. Heitner, 433 U.S. 186, 213-16, 97 S.Ct. 2569, 2584-85, 53 L.Ed.2d 683 (1977) (argument that Delaware had a strong interest in supervising the management of a Delaware corporation is undercut by failure of Delaware legislature to enact a statute designed to protect that interest).
 
 
 33
 In this case New York has articulated its interest in protecting its citizens from franchise sales abuse by enacting a comprehensive statutory scheme in furtherance of that interest. Furthermore, Secs. 686 and 691 of the statute express the intention of the New York legislature to reach nonresident corporate officers and directors who violate the act's requirements. We conclude that the limits of the due process clause will not be exceeded in this case by effectuating the statutorily expressed intent of the New York legislature.
 
 
 34
 The judgment of the district court is reversed and the case is remanded for further proceedings.