**INSTRUCTIONAL SYSTEMS, INC., Plaintiff,**

v.

**COMPUTER CURRICULUM CORP., Defendant.**

**Civ. A. No. 89–502 (AJL).**

United States District Court, D. New Jersey.

June 2, 1993.

Peter N. Perretti, Douglas S. Eakeley, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, Robert Rochford, Dunn, Pashman, Sponzilli, Swick & Finnerty, Hackensack, NJ, for plaintiff.

Andrew T. Berry, Seth T. Taube, McCarter & English, Newark, NJ, Sidney S. Rosdeitcher, Gary Stein, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant.

Bertram P. Goltz, Jr., Deputy Atty. Gen., Newark, NJ, for intervenor State of N.J.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of defendant Computer Curriculum Corp. ("CCC") for partial summary judgment pursuant to Fed.R.Civ.P. 56.[1] The issue to be

---

**1.** In support of its motion for partial summary judgment, CCC has submitted the following: Memorandum of Law in Support of Defendant Computer Curriculum Corporation's Motion for Partial Summary Judgment Based on the Commerce Clause (the "Moving Brief"); Affidavit of Sidney Rosdeitcher (the "Rosdeitcher Aff."); Affidavit of Ronald F. Fortune (the "Fortune Aff.");

decided raises an important question of Federal constitutional interpretation. Specifically, it must be decided whether extraterritorial application of the New Jersey Franchise Practices Act (the "Franchise Practices Act"), N.J.S.A. §§ 56:10 *et seq.*, violates the Commerce Clause of the United States Constitution (the "Commerce Clause"). U.S. Const. Art. I, § 8, cl. 3.

For the reasons that follow, the motion for partial summary judgment is granted. Extraterritorial application of the Franchise Practices Act, as described below, violates the Commerce Clause.

*Facts*

A. *The Parties and Their Relationship*

CCC is a Delaware corporation with its principal place of business in Sunnyvale, California. CCC 12G Statement, ¶ 1; Moving Brief at 3. Since the mid–1970s, CCC has developed and produced computer software, hardware and other products known as integrated learning systems (the "Integrated Learning Systems").[2] CCC 12G Statement, ¶ 2; Declaration of Patrick Suppes (the "Suppes Decl."), ¶ 2 (attached as Exhibit A to Rosdeitcher Aff.). CCC sells the Integrated Learning Systems to purchasers located throughout the United States. CCC 12G Statement, ¶ 2. School districts are the primary purchasers of Integrated Learning Systems. Suppes Decl., ¶ 2.

ISI is a New Jersey corporation with its sole place of business in Hackensack, New Jersey. ISI 12G Statement, ¶ 1. All of ISI's sales force and consultants work out of ISI's New Jersey facility. Certification of Phyllis Kaminer (the "Kaminer Cert."), ¶ 13 (attached as Exhibit 2 to Rochford Cert.). Since 1974, ISI has been the exclusive reseller of CCC products, including Integrated Learning Systems, in the northeast United States.[3] ISI 12G Statement, ¶ 2; Suppes Decl., ¶ 4. In this regard, the parties entered into a series of written contracts, each for a definite term.[4]

Statement of Material Facts Not in Dispute (the "CCC 12G Statement") (attached as Appendix to Moving Brief); Reply Memorandum in Support of Defendant Computer Curriculum Corporation's Motion for Partial Summary Judgment Based on the Commerce Clause (the "Primary Reply Brief"); Defendant Computer Curriculum Corporation's Memorandum of Law in Reply to the Brief of Intervenor Attorney General of New Jersey (the "Secondary Reply Brief").

In opposition to the motion for partial summary judgment, plaintiff Instructional Systems, Inc. ("ISI") has submitted the following: Memorandum of Law of Plaintiff Instructional Systems; Inc. in Opposition to Defendant's Motion for Partial Summary Judgment Based on the Commerce Clause (the "ISI Opp. Brief"); Certification of Robert E. Rochford (the "Rochford Cert."); Statement of Material Facts Not in Dispute (the "ISI 12G Statement") (attached as Appendix to ISI Opp. Brief").

Also in opposition to the motion for partial summary judgment, the Attorney General of the State of New Jersey (the "Attorney General") has submitted the following: Brief of Intervenor Attorney General of New Jersey in Opposition to Motion for Summary Judgment (the "Attorney General Opp. Brief").

Oral argument was held on 10 May 1993.

2. CCC describes its Integrated Learning Systems as follows:

[Integrated Learning Systems are] a method of using computers to assist in education. CCC's software, or "courseware," is used to help students from kindergarten through grade 12,

as well as adults, improve their skills in math, reading, science and other subjects.

Moving Brief at 3–4; *see also* Suppes Decl., ¶ 2.

3. Specifically, ISI's marketing territory (the "Marketing Territory") consisted of Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Vermont. CCC 12G Statement, ¶ 3.

4. CCC asserts that, early in its relationship with ISI, it declined a proposal that ISI be given a "perpetual distributorship." Moving Brief at 5; Fortune Aff., ¶ 12; Suppes Decl., ¶ 5. According to CCC, a series of temporally finite contracts were preferable because "[t]he computer industry is very dynamic." Moving Brief at 5; Fortune Aff., ¶ 12. In fact, CCC states that the Integrated Learning Systems industry "ha[s] undergone a dramatic transformation" in recent years. Moving Brief at 5; *see also* Fortune Aff., ¶ 2. CCC states:

What was [in the 1970s] a relatively obscure group of small start-up firms is now a rapidly growing, highly competitive $300 million business that has attracted the attention of Fortune 500 companies. Jostens, a publicly held company that has entered the I[ntegrated] L[earning] S[ystems] business in 1986, has surpassed CCC in terms of sales revenues and last year acquired the third-largest I[ntegrated] L[earning] S[ystems] firm. Several other competitors, including IBM, have also emerged. CCC itself was acquired in 1990 by Simon & Schus-

As a re-seller of CCC products, ISI purchased and licensed those products from CCC and, in turn, sold and sublicensed those products to end-users in the Marketing Territory. ISI 12G Statement, ¶ 4. According to ISI, "[a]t all times, the end users were customers of ISI and had no direct relationship with CCC." ISI 12G Statement, ¶ 4. It appears ISI does not and has not "paid a franchise fee or fee of any kind to be a reseller of CCC's products." Suppes Decl., ¶ 4. Moreover, ISI conducts its business under its own name, rather than CCC's. *Id.,* ¶ 7. Neither CCC's name nor logo appears on ISI's stationary or business cards. *Id.* From 1985 through 1989, sales of CCC's products constituted 97 percent of ISI's total sales revenues. Kaminer Cert., ¶ 80.

On 12 July 1984, CCC and ISI entered into an agreement (the "1984 Agreement") appointing ISI as the exclusive re-seller of certain CCC products, including Integrated Learning Systems, in the Marketing Territory. CCC 12G Statement, ¶ 3; *see* 1984 Agreement, ¶ 2.01 (attached as Exhibit H to Rosdeitcher Aff.). By its own terms, the 1984 Agreement was to expire on 31 July 1989. CCC 12G Statement, ¶ 4; 1984 Agreement, ¶ 13.01. Construction of the 1984 Agreement, as well as any legal relations which it created, was to be governed by California State law. CCC 12G Statement, ¶ 4; 1984 Agreement, ¶ 14.10. The 1984 Agreement contained no provision requiring renewal beyond the expiration date.

The 1984 Agreement required ISI to "use its best efforts to promote demand for and to [r]e-sell [CCC's p]roducts to the [m]arket within the Territory," to "maintain adequate facilities for such purposes"[5] and to "employ no less than four full-time sales representatives to accomplish this purpose." 1984 Agreement, ¶ 6.01; ISI 12G Statement, ¶¶ 2, 5. Moreover, in order to qualify for certain discounts on CCC products, the 1984 Agreement required ISI to adhere to a sales quota for the Marketing Territory as a whole.[6] ISI 12G Statement, ¶ 5; Suppes Decl., ¶ 9; 1984 Agreement, ¶¶ 4.02–4.03.

In return, the 1984 Agreement granted certain software and hardware user licenses to ISI and authorized ISI "to use CCC's name, trademark and logo in its advertising, trade shows, public relations materials and manuals." 1984 Agreement, ¶¶ 3.01–3.03, 6.02. It was expressly provided that these licenses and rights terminated upon expiration of the 1984 Agreement. *Id.,* ¶¶ 3.04, 6.02. Moreover, the 1984 Agreement expressly stated that "ISI shall not enjoy any rights in the CCC name, its trademarks or logo." *Id.,* ¶ 6.03; *see also id.,* ¶¶ 11.01–11.02.

CCC asserts that, during the course of the 1984 Agreement, it met with ISI and "expressed concern with ISI's performance and ability to compete" in the Marketing Territory.[7] Moving Brief at 6; *see also* Suppes Decl., ¶¶ 8, 10. CCC perceived that ISI was concentrating its sales efforts in three states—New York, New Jersey and Massa-

---

ter, Inc. The business also has expanded into segments, such as job training for business, industry and correctional institutions. Moving Brief at 5 n. 4 (citations omitted); *see also* Fortune Aff., ¶¶ 2–15 (discussing increase in sales and change in market of Integrated Learning Systems). It is predicted that by 1996, sales of Integrated Learning Systems will reach $750 million annually. Fortune Aff., ¶ 3 (citing *Electronic Media For the School Market: Review, Trends & Forecast* (1992)). ISI concedes that competition in the Integrated Learning Systems business has "become much more intense." Kaminer Cert., ¶ 60.

5. ISI contends it was required by CCC to maintain an office in New Jersey. ISI 12G Statement, ¶ 5. According to CCC, however, "ISI's location in New Jersey is purely ISI's decision. There is no function ISI has performed in New Jersey it

could not perform elsewhere." Suppes Decl., ¶ 4. In fact, the 1984 Agreement does not appear to require ISI to maintain a place of business in any specific state. *See* 1984 Agreement, ¶ 6.01.

6. CCC explains this quota/discount system as follows:

ISI has always had discounts based upon meeting certain quotas. In other words, the greater the sales volume, the greater the discount. This is a common method of pricing with respect to distributors within the computer industry. Distributors are compensated by discounts off the suggested retail price for the equipment.

Suppes Decl., ¶ 9.

7. ISI asserts that CCC expressed no dissatisfaction until 1988. Kaminer Cert., ¶¶ 66–67.

chusetts—and not adequately serving the seven other states and the District of Columbia (the "Eight States") within the Marketing Territory.[8] Moving Brief at 6; Suppes Decl., ¶ 8; *see also* Letter, dated 14 January 1988, from CCC to ISI (discussing uneven marketing efforts of ISI) (attached as Exhibit D to Rosdeitcher Aff.); Letter, dated 24 June 1988, from CCC to ISI (same) (attached as Exhibit E to Rosdeitcher Aff.).

CCC states: "ISI was doing little or no business in . . . Connecticut, Delaware, the District of Columbia, Maine, Maryland, New Hampshire, Rhode Island and Vermont." Moving Brief at 6. For instance, it appears ISI made no sales in New Hampshire or Vermont from 1981 to 1989.[9] Moving Brief at 6; Deposition Transcript of Phyllis Kaminer ("Kaminer Dep. Tr."), dated 9 May 1989, 315–16 (attached as Exhibit B to Rosdeitcher Aff.). Over the same nine-year period, ISI made only two sales in Maine. Kaminer Dep. Tr. at 316.

Allegedly based upon ISI's performance, CCC determined that decreasing the area of the Marketing Territory was necessary. Suppes Decl., ¶¶ 8–14. According to CCC:

> By neglecting parts of the [Marketing T]erritory, ISI was irretrievably damaging CCC. Competition is strong in the [I]ntegrated [L]earning [S]ystems business, and once a competitor's system is installed in a particular school district, the district is not likely to switch to CCC's system.[10] CCC's economic interests and its ability to effectively market its products [were] threatened by ISI's failure to market the disputed states. . . . There [wa]s no justification for CCC to continue to remain a passive

observer while its competitors make inroads into the states ISI ha[d] largely ignored.

Suppes Decl., ¶ 10.

In opposition, ISI explains that, in the latter part of 1988, its representatives met with CCC personnel to explain the reason for this disparity in sales. ISI states:

> [ISI] presented [CCC] with documentary evidence showing that the states with which [CCC] was concerned were either being significantly marketed by ISI and/or that there were factors . . . which made it difficult to penetrate those states with respect to sales of [I]ntegrated [L]earning [S]ystems. These factors include the high percentage of small school districts in these states, the relative paucity of entitlement funds to purchase [I]ntegrated [L]earning [S]ystems, resistance of educators and taxing authorities to expenditure of funds in these smaller states, increased telephone charges in these smaller states which cause a disproportionate expense for the use of [I]ntegrated [L]earning [S]ystems and various similar factors.

Kaminer Cert., ¶ 68.

CCC recounts that, in July 1988, its dissatisfaction with ISI's performance led CCC to (1) inform ISI that it desired to begin direct marketing of CCC products in the Eight States and (2) offer ISI a new exclusive distribution contract limiting ISI's Marketing Territory to New York, New Jersey and Massachusetts.[11] Moving Brief at 6–7. CCC emphasizes that it "intended to take over

---

**8.** ISI maintains that, prior to this time, ISI's performance had always been judged on the total amount of revenues generated from the Marketing Territory as a whole, rather than on an individual state-by-state basis. Kaminer Cert., ¶ 67.

**9.** According to CCC, "[a]lthough the [E]ight states included approximately 30 [percent] of the students within [the Marketing T]erritory, they accounted for only 11 [percent] of ISI's sales revenues to CCC from 1985 through 1987." Moving Brief at 6; *see also* Suppes Decl., ¶ 8.

**10.** ISI concedes this point:

> In fact, it is true that once any [I]ntegrated [L]earning [S]ystem has been installed, a switch by a customer to another [I]ntegrated [L]earning [S]ystem is extremely unlikely to occur, particularly for several years after the initial installation of the system.

Supplemental Certification of Phyllis Kaminer, ¶ 2 (attached as Exhibit 3 to Rochford Cert.).

**11.** CCC states that it "gave serious consideration to letting CCC's agreement with ISI to lapse entirely when the [1984 Agreement] expired." Suppes Decl., ¶ 8.

personally the marketing of its products" in the Eight States.[12] Suppes Decl., ¶ 8.

On 30 January 1989, ISI signed a new reseller agreement (the "1989 Agreement") which limited its Marketing Territory to New York, New Jersey and Massachusetts.[13] Moving Brief at 7; *see also* 1989 Agreement, ¶ 1.10 (attached as Exhibit I to Rosdeitcher Aff.). On that same day, 30 January 1989, ISI filed this lawsuit.[14] *See* Complaint (the "Complaint"), filed 30 January 1989.

### B. *The Complaint*

The Complaint alleges that, although the 1984 Agreement contained a specific expiration date, it was "always understood that the relationship between [ISI and CCC] would not be terminated except for good cause." Complaint, ¶¶ 14, 18. The Complaint further alleges that, consistent with the 1984 Agreement, "ISI has fully and completely complied with the requirements of its arrangements with CCC and has successfully utilized its best efforts to develop a demand for CCC's products in the geographical area assigned to it." *Id.,* ¶ 24.

According to ISI, it signed the 1989 Agreement "[u]nder business duress created by CCC, and without waiving its rights to test the legality of the [1989 Agreement]." *Id.,* ¶ 41. ISI describes this alleged business duress as follows:

CCC ... demanded that ISI sign the [1989 Agreement] and deliver it to CCC by January 31, 1989, together with certain ISI financial statements and the personal guarantee of [ISI's principal] Phyllis Kaminer. If ISI [did] not, CCC ... threatened to revoke its offer and begin immediately to make alternate marketing arrangements to distribute its [p]roducts in New Jersey, New York and Massachusetts.

CCC ... refused to enter into any meaningful negotiation to change or alter the terms of the proposed contract....

The offer of the [1989 Agreement] by CCC, CCC's refusal to negotiate any of its terms and the ultimatum basis on which it was presented are part of CCC's deliberate and intentional plan to destroy ISI and its business and appropriate the goodwill and property rights that ISI has created for itself in its territory since 1974....

In furtherance of this plan to destroy ISI, CCC ... refused to provide ISI with any necessary technical, pricing and discount information with respect to the new IBM CCC hardware program now being offered ... unless and until ISI execute[d] and deliver[ed] the [1989 Agreement] without change by ISI, together with the requisite financial information.

*Id.,* ¶¶ 36–37, 39–40; *see also* Kaminer Cert., ¶¶ 68–69.

ISI alleges, *inter alia,* that the 1984 Agreement constitutes a franchise under New Jersey Law, as defined in N.J.S.A. § 56:10–3(a). Complaint, ¶ 32. ISI further alleges that CCC's actions with respect to the 1989 Agreement—namely, failing to renew the 1984 Agreement without good cause and "attempting to impose unreasonable standards of performance upon ISI"—violate the Franchise Practices Act, N.J.S.A. §§ 56:10–5 and 56:10–7 (the "Franchise Practices Act Claim").[15] *See* Complaint, ¶ 14.

---

**12.** It appears that this is not the first time that ISI Marketing Territory has been changed. For example, CCC indicates:

[T]he Eastern Pennsylvania area was within ISI's territory. Subsequently, this territory was removed. At an earlier time, ISI did not have the State of Maryland or the District of Columbia within its territory; this was later added.

Suppes Decl., ¶ 6. CCC states that, prior to this litigation, ISI never claimed that its distributorship of CCC products was made in perpetuity. *Id.,* ¶ 5.

**13.** Nevertheless, it appears that, at least for 1989, ISI continued and enhanced its sales activities in the Eight States. *See* Kaminer Cert., ¶¶ 70–71.

**14.** The Complaint was filed in the Superior Court of New Jersey, Chancery Division, Passaic County. *See* Complaint at 1. On 6 February 1989, the case was removed to this court pursuant to 28 U.S.C. § 1441. *See* Notice of Removal, filed 6 February 1989, at 1. Jurisdiction is alleged pursuant to 28 U.S.C. § 1332. *Id.*

**15.** The Complaint also sets forth six additional counts alleging breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with respect to economic advantage, unfair competition, unjust enrichment and breach of fiduciary relationship. Complaint, ¶¶ 45–66.

ISI seeks injunctive relief "restraining CCC from terminating its relationship with ISI as substantially set forth in the [1984] Agreement." *Id.*, ¶ 44(a). ISI also seeks damages and a declaration of ISI's and CCC's rights under their relationship. *Id.*, ¶ 44(b), (d).

### C. *The Franchise Practices Act Claim*

Section 10–3(a) of the Franchise Practices Act, N.J.S.A. § 56:10–3(a) defines "franchise" as follows:

> [A] written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

*Id.*

Section 10–5 of the Franchise Practices Act, N.J.S.A. § 56:10–5, sets forth exacting requirements for the termination of a franchise defined under the Act. Section 10–5 provides in pertinent part:

> It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel or *fail to renew* a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchise at least 60 days in advance of such termination, cancellation, or failure to renew.... It shall [also] be a violation of this act for a franchisor to terminate, cancel or *fail to renew* a franchise *without good cause.* For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to *substantially comply* with those requirements imposed upon him by the franchise.

N.J.S.A. § 56:10–5 (emphasis added).

 As the Third Circuit has stated, this section of the Franchise Practices Act creates "an exception to the general rule that two businesses are free to terminate their business relationship according to the terms of their contract." *New Jersey Am., Inc. v. Allied Corp.*, 875 F.2d 58, 61 (3d Cir.1989).

Moreover, "good cause" for termination does not include bona fide business reasons for discontinuing the franchise relationship. *See Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.*, 86 N.J. 453, 465–66, 432 A.2d 48 (1981).

Finally, Section 10–7 of the Franchise Practices Act, N.J.S.A. § 56:10–7, prohibits certain practices by franchisors. Specifically, pursuant to Section 10–7(e), it is a violation of the Franchise Practices Act for any franchisor "to impose unreasonable standards of performance upon a franchisee." *Id.*, § 56:10–7(e).

### D. *Procedural History*

In June 1989, ISI moved for a preliminary injunction to prevent the 1989 Agreement from taking effect such that the Marketing Territory would be curtailed to three states. Opp. Brief at 8–9. CCC opposed the motion for preliminary injunction and cross-moved for partial summary judgment on the Franchise Practices Act Claims. *Id.* at 9. In support of its cross-motion for partial summary judgment, CCC argued that applying the Franchise Practices Act to this case would be an unconstitutional restraint on interstate commerce (the "Commerce Clause Argument"). *See* Memorandum of Points and Authorities in Opposition to the Application for Preliminary Injunction and Motion for Partial Summary Judgment, 12 (citing *Healy v. Beer Instit.*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)).

In response to the Commerce Clause Argument posed by CCC, ISI moved to have this court abstain and remand the Franchise Practices Act issues in this case to the New Jersey Superior Court, to afford the New Jersey state courts a fair opportunity to decide those issues, pursuant to *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

By an opinion, filed 20 July 1989 (the "20 July 1989 Decision"), the ISI motion for abstention was granted. 20 July 1989 Decision at 3. It was stated:

> The threshold issue in this case is necessarily whether ISI has properly invoked the Franchise Practices Act. Before a

court may legitimately consider whether ISI is a franchise[e] within the meaning of the [Franchise Practices A]ct and was terminated for good cause, it must ascertain whether the [Franchise Practices A]ct applies as suggested by ISI.... [A] court should not work through the mechanics of a statute not properly placed before it.... Only by abstaining at this time and affording the courts of New Jersey a fair opportunity to provide a definitive interpretation of Franchise Practices Act will judicial resources be expended wisely.

*Id.* at 13.

Accordingly, Count One of the Complaint—the Franchise Practices Act Claim—was remanded to state court. *Id.* at 16. Specifically, the following issues were identified for resolution by the New Jersey State courts: (1) Whether the Franchise Practices Act has extraterritorial reach beyond the State of New Jersey and, if so, to what extent and (2) what are the definitions and standards of "community of interest," "license" and "place of business" under the Franchise Practices Act. Order, filed 27 July 1989 (the "27 July 1989 Order") at 1. The 27 July 1989 Order was subsequently clarified to allow the New Jersey State courts to also determine (1) whether there is a "community of interest" between ISI and CCC and (2) whether ISI has a "place of business" within the meaning of the Franchise Practices Act.

The remaining counts of the Complaint were administratively terminated pending the state court resolution of the Franchise Practices Act Claim. *Id.* at 1–2. Jurisdiction was retained to apply the law established by the New Jersey courts to the facts of this case, to resolve any constitutional challenge to the Franchise Practices Act and to determine any application for injunctive relief. *Id.*

### E. Resolution of the Franchise Practices Act By the New Jersey Supreme Court

In *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d

124 (1992), after three years of post-remand proceedings, the New Jersey Supreme Court reached a decision on the remanded issues.

The New Jersey Supreme Court determined the relationship between ISI and CCC contained all the elements necessary to constitute a franchise within the meaning of the Franchise Practices Act.[16] First, the court found that "[t]here was sufficient evidence to support a finding of fact that the 1984 Agreement 'contemplated' that ISI would have a 'fixed business location' in New Jersey." *Id.* at 348–51, 614 A.2d 124.

Second, the New Jersey Supreme Court determined that CCC had granted ISI a license within the meaning of the Franchise Practices Act, by allowing ISI to use CCC's name, by requiring ISI to use its "best efforts" to promote CCC's name, trademark and logo," and by establishing ISI as the exclusive distributor of CCC products in the Marketing Territory. *Id.* at 351–55, 614 A.2d 124. The court reached this result despite the fact that ISI conducted business under its own name and did not pay a franchise fee to CCC. *Id.*

Third, the New Jersey Supreme Court held that sufficient facts existed to determine that the CCC/ISI relationship showed a "community of interest," as the term is used by the Franchise Practices Act. *Id.* at 366, 614 A.2d 124. The court explained that the "community-of-interest requirement addressees the inequality of bargaining power between the parties and is critical in distinguishing franchises from other types of businesses." *Id.* at 356, 614 A.2d 124. The court explained:

The Act's concern is that once a business has made substantial franchise-specific investments it loses all or virtually all of its original bargaining power regarding continuation of the franchise. Specifically, the franchise cannot do anything that risks termination, because that would result in a

---

**16.** Two of the seven Justices dissented from the *Instructional Systems* decision on the grounds that the relationship between CCC and ISI was not a franchise within the meaning of the Fran-

chise Practices Act. 130 N.J. at 380, 614 A.2d 124 (Clifford, J., and D'Annunzio, J.A.D. (temporarily assigned), dissenting).

loss of much or all of the value of its franchise-related investments.

*Id.* at 357, 614 A.2d 124. The court then reviewed the facts and determined, *inter alia,* that (1) ISI had made "franchise-specific investments"—such as purchasing copyrighted computer software—and (2) ISI had developed goodwill and contacts, none of which could be used if the relationship with CCC ended. *Id.* at 362–66, 614 A.2d 124. Accordingly, the New Jersey Supreme Court concluded that a "community of interest" existed between ISI and CCC. *Id.* at 366, 614 A.2d 124.

Having found that the relationship between CCC and ISI constituted a franchise, the New Jersey Supreme Court then determined that the Franchise Practices Act had, at best, only incidental extraterritorial effect. *Id.* at 370–71, 614 A.2d 124. The court began, however, by recognizing two facts: (1) there was nothing to indicate that CCC intended or agreed that the Franchise Practices Act would apply to CCC's activities in states other than New Jersey and (2) New Jersey has no power to regulate commerce that occurs entirely beyond its borders. *Id.* at 367, 614 A.2d 124 (citing *Healy,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)).

The New Jersey Supreme Court, nevertheless, distinguished *Healy* and *Edgar.* The court stated:

> [I]n contrast to *Edgar,* the [Franchise Practices Act] is applicable only to specific transactions affecting New Jersey, *i.e.,* franchises that have a "place of business" in New Jersey.
>
> Were it otherwise, nearly every aspect of substantive state law would be disabled from affecting the conduct of multi-state corporations. When New Jersey imposes a legal duty on the volitional behavior of a contracting party, that ruling will often have effects beyond state boundaries.

130 N.J. at 368–69, 614 A.2d 124.

The New Jersey Supreme Court also briefly analyzed the question of extraterritorial reach in terms of the due-process limitations on choice of law. *Id.* at 369, 614 A.2d 124. In this sense, the court stated that due process requires "contacts" with the forum, "interests" of the state arising out of those contacts and "fairness" to the defendant.[17] *Id.* (citing *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521, *reh'g denied,* 450 U.S. 971, 101 S.Ct. 1494, 67 L.Ed.2d 623 (1981)). The court then found that the Franchise Practices Act satisfied this test. The court stated:

> At its core, the New Jersey Franchise Practices Act is meant to deal with the unconscionable business practices affecting New Jersey franchises. Under the *Hague* formulation we surely find "contacts" with the forum, "interests" arising out of those contacts, and "fairness to the defendant" in the statute.
>
> Fairness to the defendant is implicit in the statute's requirements. By definition, the Act, and particularly its community-of-interest requirement, is intended to protect business parties who made a franchise-specific capital investment of either goods or services in New Jersey.... Thus the statute's own terms, including the community-of-interest and good-cause requirements, will allow application of the Act only in situations in which there are "contacts" with the forum, "interests" arising out of those contacts, and "fairness to the defendant" in the sense that a defendant who acts fairly with a franchise need fear no oppressive regulation. *Therefore, the Act's own terms curtail any impermissible extraterritorial effect and insure its constitutionality under Commerce Clause or due process analysis despite some incidental extraterritorial effects.*

*Id.* at 370–71, 614 A.2d 124 (emphasis added) (citations omitted).

*Discussion*

A. *Summary Judgment Standard of Review*

■ To prevail on a motion for summary judgment, the moving party must establish

---

17. The court noted that this choice-of-law test "echoed" the Commerce Clause test established in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), "in terms of the legitimacy of local interest and the reasonableness of regulation." *Instructional Systems,* 130 N.J. at 369, 614 A.2d 124.

"there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll-Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

■ Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *"specific facts* showing that there is a *genuine issue for trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial".

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied sub nom., Roselle v. Brown*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray*, 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted); *see also Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Ban-*

*corporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. ·Commerce Clause

#### 1. Standard of Review

■ The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. The United States Supreme Court has long recognized that "this affirmative grant ·of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy,* 491 U.S. at 326 n. 1, 109 S.Ct. at 2494 n. 1 (citing *Hughes v. Oklahoma,* 441 U.S. 322, 326 & n. 2, 99 S,Ct. 1727, 1731 & n. 2, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949)); *see also Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 927–28, 47 L.Ed.2d 55 (1976); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852).

In determining whether a state statute improperly effects interstate commerce, the Supreme Court has stated:

The principles guiding this assessment ... reflect the Constitution's special concern both with the maintenance of a national economic union *unfettered* by state-imposed limitations on interstate commerce and with the *autonomy of the individual States* within their respective spheres.

*Healy,* 491 U.S. at 336, 109 S.Ct. at 2499 (emphasis added).

■ The Supreme Court has indicated that its Commerce Clause jurisprudence concerning the extra-territorial effects of state economic regulation stand "at a minimum" for three propositions.. *Id.*

First, the Commerce Clause precludes the application of a state statute to commerce that takes place *wholly outside* of the State's borders, whether or not the commerce has effects within the State.

*Id.* (emphasis added); *see also Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 2640–41, 73 L.Ed.2d 269 (1982) (plurality opinion);

Second, a statute that controls commerce occurring *wholly outside* the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extra-territorial reach was intended by the legislature. The critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State.

*Healy,* 491 U.S. at 336, 109 S.Ct. at 2499 (emphasis added); *see also Brown–Forman Distillers Coop. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90. L.Ed.2d 552 ·(1986); and

Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.

*Healy,* 491 U.S. at 336, 109 S.Ct. at 2499.

■ The Supreme Court has explained that this last principle stands for two propositions: (1) "Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory scheme into the jurisdiction of another State," and (2) "specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Id.; see also Edgar,* 457 U.S. at 642, 102 S.Ct. at 2640; *Brown–Forman,* 476 U.S. at 582, 106 S.Ct. at 2086 ("[f]orcing a merchant to seek regulato-

ry approval in one State before undertaking a transaction in another directly regulates interstate commerce").

In applying these principles, the Supreme Court has adopted a two-tiered approach to analyzing economic regulation under the Commerce Clause. *Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. at 2499 n. 14; *Brown–Forman*, 476 U.S. at 578–79, 106 S.Ct. at 2084. When a statute *"directly regulates* or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the Court has "generally struck down the statute *without further inquiry." Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. at 2499 n. 14 (emphasis added); *see also Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084 (citing *Edgar*, 457 U.S. at 640–43, 102 S.Ct. at 2639–41; *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Shafer v. Farmers' Grain Co.*, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925)).

In contrast, when a statute "has only *indirect effects* on interstate commerce and regulates evenhandedly," the Court has "examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." [18] *Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. at 2499 n. 14 (emphasis added); *see also Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084; *Pike*, 397 U.S. at 142, 90 S.Ct. at 847.

Because the Franchise Practices Act has the effect of *directly regulating* interstate commerce—specifically, transactions between non-New Jersey entities which take place wholly outside of New Jersey—this specific line of Supreme Court jurisprudence is discussed below.

### 2. Direct Regulation of Interstate Commerce

In a long line of cases, the Supreme Court has invalidated state statutes because those statutes have the effect of regulating transactions which take place wholly beyond the enacting state's borders. *Healy* is the most recent case in this line. In *Healy*, the State of Connecticut passed a law which required out-of-state shippers of beer to affirm that their posted prices for beer sold to Connecticut wholesalers were, at moment of posting, no higher than the prices at which those products were sold in states bordering Connecticut. 491 U.S. at 326, 109 S.Ct. at 2494. Moreover, in calculating the "lowest price" offered in border states, the Connecticut statute deducted from the reported price the value of any rebates, discounts, special promotions or other inducements that out-of-state shippers offered in one or more border states. *Id.* at 327, 109 S.Ct. at 2494.

The *Healy* Court invalidated the Connecticut statute. It determined that the statute had the extraterritorial effect "of preventing brewers from undertaking competitive pricing in [the border states] based on prevailing marketing conditions." *Id.* at 338, 109 S.Ct. at 2500. Two considerations affected this result. First, the Connecticut requirement that the posted price in Connecticut be no higher than in any bordering state had "the practical effect" of controlling prices in those bordering states because, months in advance, it locked brewers into those out-of-state prices. *Id.* at 338–39, 109 S.Ct. at 2500–01. Second, because volume discounts were permitted in Connecticut's border states, but not in Connecticut, and because the lowest of the volume-discounted prices would have to offered as the regular price for an entire month in Connecticut, "the effect of Connecticut's affirmation scheme [was] to deter volume discounts in each [of Connecticut's] border states." *Id.* at 339, 109 S.Ct. at 2500.

On the basis of these extraterritorial effects, the *Healy* Court summarized the operative principle of law:

> The Connecticut statute ... requires out-of-state shippers to forgo the implementa-

---

**18.** Despite establishing the distinction in analysis between statutes having direct and indirect extraterritorial effect, the Supreme Court has indicated that "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to *Pike v. Bruce Church* balanc-ing approach." *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084. In either situation, "the critical consideration is the overall effect on both local and interstate activity." *Id.* (citing *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440–41, 98 S.Ct. 787, 793–94, 54 L.Ed.2d 664 (1978)).

tion of competitive pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions. As we specifically reaffirmed in *Brown–Forman*, States may not deprive businesses and consumers of "whatever competitive advantages they may possess" based on the conditions of the local market. The Connecticut statute does precisely this.

*Id.* at 339, 109 S.Ct. at 2500–01 (quoting *Brown–Forman*, 476 U.S. at 580, 106 S.Ct. at 2085). *Brown–Forman* presented almost the same situation.

In *Brown–Forman*, a New York statute required every liquor distiller or producer that sold liquor within New York to sell at a price that was no higher than the lowest price charged to wholesalers anywhere else in the United States. 476 U.S. at 575, 106 S.Ct. at 2082. Despite the facts that (1) the New York law regulated all distillers—both in and outside of New York—evenhandedly and (2) New York's asserted interest in assuring the lowest possible prices for its residents was legitimate, the Supreme Court struck down the statute as violative of the Commerce Clause. *Id.* at 579–84, 106 S.Ct. at 2084–87.

As in *Healy*, the *Brown–Forman* Court reasoned that the "practical effect" of the New York law was to set prices in other states and to require distillers to forgo competitive advantages in other states: "Once a distiller ha[d] posted prices in New York, it was not free to change its prices elsewhere in the United States during the relevant month." *Id.* at 582, 106 S.Ct. at 2086. The Court explained:

> While a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess....
>
> The mere fact that the effects of New York's ABC Law are triggered only by sales of liquor within the State of New York ... does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state.

While New York may regulate the sale of liquor within its borders, and may seek low prices for its residents, it may not "project its legislation into [other states] by regulating the price to be paid" for liquor in those states.

*Id.* at 581–83, 106 S.Ct. at 2085–86 (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 528, 55 S.Ct. 497, 503, 79 L.Ed. 1032 (1935)).

The *Brown–Forman* Court also rejected the argument that a distiller could avoid violating the New York Statute and its binding effects by seeking approval of the New York Liquor Authority to lower its prices in other states. *Id.*, 476 U.S. at 583, 106 S.Ct. at 2086. The Court explained that, even if such approval could be obtained, by no means a sure proposition, such an approach did not pass constitutional muster because "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id.* at 582, 106 S.Ct. at 2086.

Finally, in *Edgar*, the Supreme Court addressed the constitutionality of an Illinois statute which required that any tender offer for the shares of an Illinois "target company" had to be registered with the Illinois Secretary of State. 457 U.S. at 626, 102 S.Ct. at 2632. A target company was defined by the Illinois statute as, *inter alia*, a corporation or other issuer of securities which met two of the following three conditions: the corporation (1) maintained its principal executive office in Illinois, (2) was organized under the laws of Illinois or (3) had at least 10 percent of its stated capital and paid-in surplus represented within the state. *Id.* at 627, 102 S.Ct. at 2633. The Illinois Secretary of State was permitted to deny registration of the takeover offer if, after a hearing, he or she determined the offer failed to provide full and fair disclosure to offerees of all material information. *Id.*

As in *Healy* and *Brown–Forman*, the *Edgar* Court struck down the Illinois statute on the ground that the statute directly regulated interstate commerce and, specifically, transactions occurring entirely outside of Illinois. *Id.* at 640–43, 102 S.Ct. at 2639–41. The Court explained that, given the expan-

sive definition of a "target corporation"—which required the corporation, rather than the corporation's shareholders, to be physically present in Illinois—the Illinois law "could be applied to regulate a tender offer which would not affect a single Illinois shareholder." *Id.* at 642, 102 S.Ct. at 2640. In other words, the Illinois statute gave the Illinois Secretary of State "nationwide reach ... to determine whether a tender offer may proceed anywhere." *Id.* at 643, 102 S.Ct. at 2641.

The *Edgar* Court concluded:

> It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect....
>
> The Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State....
>
> Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, it must be held invalid....[19]

*Id.* at 642–43, 102 S.Ct. at 2640–41 (citing *Shafer*, 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977); *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945)).

### 3. New Jersey Franchise Practices Act as the Direct Regulation of Interstate Commerce

When examined in light of the Supreme Court's Commerce Clause jurisprudence, specifically, the decisions in *Healy, Brown–Forman* and *Edgar*, the Franchise Practices Act violates the Commerce Clause by direct-ly regulating transactions which occur entirely outside of the state of New Jersey.

In the case *sub judice*, the 1984 Agreement expired in July 1989. Displeased with ISI's performance in all but three of the states in Marketing Territory, and facing a level of competition not in existence during earlier phases of its relationship with ISI, CCC made a business decision to change its methods of product distribution and sales. Accordingly, CCC chose not to renew its agreement with ISI on its previous terms. It desired instead to market directly its Integrated Learning Systems and other products in the Eight States, without employing ISI as a re-seller.

ISI invoked Section 56:10–15 of the Franchise Practices Act to prevent CCC from terminating its *exclusive* distributorship of CCC's products in the Eight States. ISI seeks an injunction to prohibit CCC, a non-New Jersey corporation, from selling its Integrated Learning Systems and other products, either directly or through another franchisee, to consumers in the area of the Eight States. Accordingly, if the Franchise Practices Act were applied in the manner suggested by ISI, and if the injunction were granted, the Act would have a *direct* effect on interstate commerce because it would prohibit transactions between non-New Jersey residents occurring entirely outside of New Jersey. Specifically, extraterritorial application of the Franchise Practices Act would (1) regulate distribution of CCC's products within other states, (2) prevent CCC from changing its method of distribution in these states and (3) prohibit interstate transactions between CCC and school districts in these states.[20]

---

**19.** The *Edgar* Court also analyzed the Illinois statute under the *Pike* balancing analysis and concluded that the local interests served did not outweigh the substantial burdens imposed upon commerce by the statute. The Court explained:

> The effects of allowing the Illinois Secretary of State to block a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism pro-

vides incumbent management to perform well so that stock prices remain high is reduced. 457 U.S. at 643, 102 S.Ct. at 2641.

**20.** To the extent the New Jersey Supreme Court characterized the extraterritorial effects of the Franchise Practices Act as "incidental," its analysis is not adopted. The *Instructional Systems* court failed to analyze these effects in detail. Instead, because the Franchise Practices Act regulated New Jersey franchisees, the New Jersey Supreme Court simply stated that the Franchise Practices Act regulates "in-state conduct that has out-of-state effects." 130 N.J. at 368, 614 A.2d 124. Nevertheless, this situation is no different

The extraterritorial application of the Franchise Practices Act is a *per se* violation of the Commerce Clause. The Supreme Court has clearly established that the Commerce Clause "precludes the application of a state statute to commerce that takes place *wholly outside* of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499 (emphasis added); *see also Edgar*, 457 U.S. at 642–43, 102 S.Ct. at 2640–41.

Similarly, while there is no question that New Jersey has the right to protect New Jersey franchisees, New Jersey has no right to regulate non-New Jersey transactions or to project its law into other states.[21] Again, the Supreme Court has established that "a statute that controls commerce occurring *wholly outside* the boundaries of a State *exceeds the inherent limits of the enacting State's authority and is invalid* regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499 (emphasis added); *see also Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084. The critical inquiry, whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State, is clearly met in this case. *See Healy*, 491 U.S. at 336, 109 S.Ct. at 2499; *see also Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084.

Extraterritorial application of the Franchise Practices Act also has the direct effect of imposing New Jersey state law on the creation of franchise relationships and to the selling of products in other states. The Commerce Clause, however, "protects against inconsistent legislation arising from the protection of one state regulatory scheme into the jurisdiction of another State," and insures "the autonomy of the individual States within their respective spheres," *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499; *see also Edgar*, 457 U.S. at 642, 102 S.Ct. at 2640.

In this case, prohibiting CCC from directly or indirectly marketing its products in the Eight States, other than through ISI, would mean that, as far as the 1984 Agreement is concerned, New Jersey Law would replace the law of Connecticut, Delaware, the District of Columbia, Maine, Maryland, New Hampshire, Rhode Island and Vermont. This result is problematic. As well, it appears only three of the Eight States have adopted franchise termination legislation similar to New Jersey. *See* Conn.Gen.Stat. Ann. § 42–133f(a); 6 Del.Code Ann. tit. § 2552(a); D.C.Code Ann. § 29–1203; *see also* Reynolds, *Good Cause For Franchise Termination: An Irreconcilable Difference Between Franchise Fault and Franchisor Market Withdrawal*, 1992 B.Y.U.L.Rev. 785 n. 7; 2 W.M. Garner, *Franchise and Distribution Law and Practice*, § 10:01 (1990).

Whether the absence of franchise termination legislation in several states in the Marketing Territory reflects a conscious choice on the part of those states to not protect franchisees is irrelevant.[22] The im-

---

than in *Healy* or *Brown–Forman*. Like the New Jersey Franchise Practices Act, the statutes in *Healy* and *Brown–Forman* concerned only instate transactions—*i.e.* sales of alcohol. Nevertheless, because the effect of these statutes was to regulate commercial transactions entirely outside of the enacting states, the statutes were found to have extraterritorial *effects* violative of the Commerce Clause. Moreover, it is again noted that this precise issue—namely, the constitutionality of extraterritorial application of the Franchise Practices Act—was reserved by CCC for consideration by this court. *See supra* at p. 839.

**21.** CCC does "not question New Jersey's power to protect in-state franchises insofar as their distribution activities within New Jersey are concerned." Moving Brief at 20 (emphasis omitted). Thus, CCC "does not dispute that New Jersey may apply the [Franchise Practices Act] to distri-

bution activities within its borders." Secondary Reply Brief at 2.

**22.** As stated by CCC, franchise termination laws raise significant issues of economic policy and have engendered "intense debate and considerable controversy." *See* Moving Brief at 21 (quoting ABA Antitrust Sec., Monograph No. 17, *Franchise Protection: Laws Against Termination and the Establishment of Additional Franchises*, 2, 19–70 (1990)). Proponents have argued such laws are necessary to protect franchisees from unscrupulous treatment by franchisors. *See, e.g.,* General Motors Corp. v. Gallo ·GMC Truck Sales, Inc., 711 F.Supp. 810, 814 (D.N.J.1989); Shell Oil Co. v. Marinello, 63 N.J. 402, 409, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

In contrast, opponents have argued such legislation injures consumers, interferes with freedom

portant point is that applying the New Jersey Franchise Practices Act in states without such regulation—on transactions between or among non-New Jersey residents occurring wholly outside of New Jersey—imposes restrictions on franchise regulation, if not formation, and on the selling of goods not otherwise present in those states.[23] Such extraterritorial imposition of New Jersey law infringes on state autonomy and creates the very inconsistency in legislation which the Commerce Clause was designed to protect. *See Healy,* 491 U.S. at 336, 109 S.Ct. at 2499. New Jersey simply may not project its legislation into other states, as contemplated in this case. *Brown–Forman,* 476 U.S. at 582–83, 106 S.Ct. at 2086.

Finally, the Franchise Practices Act *per se* violates the Commerce Clause because no state may force an out-of-state merchant to seek approval in that state before undertaking a transaction in another state. *Healy,*

491 U.S. at 336, 109 S.Ct. at 2499; *Edgar,* 457 U.S. at 642, 102 S.Ct. at 2640. This is precisely the effect of the "good cause" requirement of the Franchise Practices Act. Absent a showing of "good cause" for nonrenewal, the Franchise Practices Act would prohibit CCC from marketing its products—directly or indirectly through a new distributor—in the Eight States, despite the fact that the 1984 Agreement has expired by its own terms.

In effect, CCC could not regain the right to sell its products in the Eight States—covering an area of more than 65,000 square miles outside of New Jersey's borders—until it established, to the satisfaction of a New Jersey court, that it had met New Jersey's statutory requirement of termination or nonrenewal for "good cause." Until that time, the 1984 Agreement would continue in virtual perpetuity, despite its contractually agreed-upon expiration date.[24] *See Instructional*

of contract and is anti-competitive because it prevents manufacturers from choosing the most efficient means to distribute their products. *See, e.g., Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 282 (7th Cir.1992); Reynolds, *Good Cause For Franchise Termination,* 1992 B.Y.U.L.Rev. 785; Brickley, Dark & Weisbach, *The Economic Effects of Franchise Termination Laws,* 34 J.L. & Econ. 101, 126 (1991).

**23.** Nationwide, it appears only seventeen states, the District of Columbia, Puerto Rico and the Virgin Islands have adopted general franchise termination statutes. *See* Ark.Code Ann. § 4–72–204; Cal.Bus. & Prof.Code § 20020; Conn.Gen. Stat.Ann. § 42–133f(a); Del.Code Ann. tit. 6, § 2552; D.C.Code.Ann. § 29–1203; Haw.Rev. Stat. § 482E–6; Ill.Comp.Stat. ch. 815, ¶ 705, § 19 & ¶ 710, § 9; Ind.Code Ann. § 23–2–2.7–1; Mich.Comp.Laws Ann. § 445.1527; Minn.Stat. Ann. § 80C.14; Miss.Code Ann. § 75–24–53; Mo.Ann.Stat. § 407.405; Neb.Rev.Stat. § 87–404; N.J.S.A. § 56:10–15; P.R.Laws Ann. tit. 14, § 278a; Tenn.Code Ann. §§ 47–25–1503 to 1504; Va.Code Ann. § 13.1–564; V.I.Code Ann. tit. 12a, § 132; Wash.Rev.Code Ann. § 19.100.180; Wis.Stat.Ann. § 135.03.

Seven of these states distinguish between termination and renewal—allowing non-renewal of franchise agreements with no "good cause" requirement—or require merely that notice be given prior to non-renewal or termination. *See* Cal.Bus. & Prof.Code § 20020; Mich.Comp. Laws Ann. § 445.1527; Minn.Stat.Ann. § 80C.14(3)–(4); Miss.Code Ann. § 75–24–53; Mo.Ann.Stat. § 407.405; Va.Code Ann. § 13.1–564; Wash.Rev.Code Ann. § 19.100.180(2)(i)–(j); *see also* Ind.Code Ann. § 23–2–2.7–1 (requiring

good cause for non-renewal but also providing that statute "shall not prohibit a franchise agreement from providing that the agreement is not renewable upon expiration"); Neb.Rev.Stat. § 87–404 (same).

Congress has declined to enact a Federal franchise termination statute, after hearing testimony opposing such a statute from both the Department of Justice and the American Bar Association. *See* Hearings on H.R. 5016 Before Subcomm. on Consumer Protection and Finance of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess., 50 (1977) (testimony of Joe Sims, Deputy Assistant Attorney General, Department of Justice); Hearings on S. 1256 Before Senate Judiciary Comm., 97th Cong., 2d Sess., 19–21 (1982) (testimony of William Baxter, Assistant Attorney General, Department of Justice); *see also* "ABA Adopts Resolution Opposing Franchise Bill," 852 Antitrust & Trade Reg.Rep. (BNA) A–15 (23 Feb.1978).

**24.** This prohibition is particularly harsh in a case, such as this, in which the franchisor has granted an *exclusive* multi-state distribution relationship with a New Jersey franchisee. In effect, in ten states outside of New Jersey, the Franchise Practices Act would require CCC to market its products through ISI or not at all.

In this regard, the Franchise Practices Act violates the Commerce Clause by requiring CCC to forgo potential economic advantages in non-New Jersey markets. *Healy,* 491 U.S. at 339, 109 S.Ct. at 2500; *Brown–Forman,* 476 U.S. at 580, 106 S.Ct. at 2084. The Act prohibits CCC from changing its distribution methods no matter how much the industry has changed over the

*Systems*, 130 N.J. at 372, 614 A.2d 124 (recognizing that only judicial inquiry on a case-by-case basis can decide whether Franchise Practices Act "bestow[s] a franchise for as long as the franchisee chooses to retain it").

As the Supreme Court indicated in *Brown–Forman:* "Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another *directly regulates* interstate commerce." 476 U.S. at 582, 106 S.Ct. at 2086 (emphasis added). Furthermore, in this case, the burden on interstate commerce is particularly onerous. Because the Franchise Practices Act requires judicial approval, rather than regulatory approval, an out-of-state franchisor will likely be required to engage in protracted and expensive litigation before it is free from the constraints of the Franchise Practices Act. *See Instructional Systems*, 130 N.J. at 374, 614 A.2d 124 ("many attempts by a franchisor to terminate a franchise for good cause will result in litigation") (dissent).

This case illustrates the fact of delay, as well as impact on interstate commerce, by the application of the Franchise Practices Act. The present dispute has been ongoing for four years. During this time, the case has been reviewed by the Chancery Division of the New Jersey Superior Court, the Appellate Division of the New Jersey Superior Court, the New Jersey Supreme Court and now is back before this court.[25] Nevertheless, after four years of litigation, the *only* issues that have been decided are those related to the preliminary issue of whether the CCC/ISI relationship constituted a franchise subject to the provisions of the Franchise Practices Act. Although this question has been answered by the New Jersey Supreme Court in the affirmative, CCC's right to market its products in the Eight States outside of New Jersey has still not been resolved. The New Jersey Supreme Court did not decide, *inter alia*, whether CCC had good cause to not renew the 1984 Agreement or whether ISI waived its right to renewal by signing the 1989 Agreement. *See Instructional Systems*, 130 N.J. at 373, 614 A.2d 124. After four years of litigation, extraterritorial application of the Franchise Practices Act still prohibits CCC from selling its products in the Eight States outside of New Jersey.

As argued by CCC, the bottom line in this case is that the Franchise Practices Act compels CCC to undergo protracted litigation to exercise a right that New Jersey cannot constitutionally regulate—namely, the right of a non-New Jersey corporation to market and sell its products in states outside out New Jersey. These transactions neither cross New Jersey's borders nor involve New Jersey parties.

It is a *per se* violation of the Commerce Clause for New Jersey to regulate directly these wholly extraterritorial transactions, to impose its statutory scheme on other states and to require out-of-state franchisors to seek New Jersey judicial approval before entering into out-of-state transactions. *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499; *Brown–Forman*, 476 U.S. at 581–83, 106 S.Ct. at 2085–86; *Edgar*, 457 U.S. at 642–43, 102 S.Ct. at 2640–41.

4. Arguments That Franchise Practices Act Does Not Violate Commerce Clause

ISI and the New Jersey Attorney General make numerous arguments in support of the

course of the 1984 Agreement and irrespective of whether CCC or a different distributor could do a better job than ISI. *See Instructional Systems*, 130 N.J. at 374, 614 A.2d 124 (dissent) (citing *Westfield Centre*, 86 N.J. 453, 432 A.2d 48; *New Jersey Am.*, 875 F.2d 58). It is significantly burdensome for the Franchise Practices Act to prohibit CCC from pursuing marketing opportunities in states otherwise neglected by ISI—such as Maine, New Hampshire and Vermont—given the highly competitive nature of the Integrated Learning Systems business. *See supra* at pp. 836–37, nn. 4, 10. As the court recognized in *Central GMC, Inc. v. General Motors Corp.*, 946

F.2d 327 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992): The restrictions implicit in the [C]ommerce [C]lause are designed to deflect such rigidity in our national economic system and to prohibit states from hindering the "reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition."
*Id.* at 334 (quoting *Edgar*, 457 U.S. at 643, 102 S.Ct. at 2641).

25. As stated, this case was originally filed in New Jersey Superior Court and later removed to this court. *See supra* at n. 14.

position that the Franchise Practices Act does not violate the Commerce Clause. These arguments, reviewed below, are without merit.

### a. Argument that Franchise Practices Act is Narrowly Drawn

■ ISI initially argues that the Franchise Practices Act is narrowly drawn and regulates only New Jersey based relationships between franchisors and franchisees. ISI Opp. Brief at 11–13. According to the ISI:

> The statute was carefully drafted to preclude its application to franchisor-franchisee relationships that exist entirely outside of the state. By its own terms, the [Franchise Practices Act] applies only to those franchise relationships in which New Jersey has a compelling interest. It applies only to a franchise "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey."

*Id.* at 12 (quoting N.J.S.A. § 56:10–4).

This argument misses the point. As the Supreme Court has indicated, the "critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State." *Healy,* 491 U.S. at 336, 109 S.Ct. at 2499; *see also Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084. Because the *effect* of the Franchise Practices Act is to directly regulate transactions which occur wholly outside of New Jersey between non-New Jersey parties, the Franchise Practices Act *per se* violates the Commerce Clause, regardless of whether (1) the Franchise Practices Act was intended to apply only to in-state franchise relationships, (2) New Jersey has a legitimate interest in seeking to protect New Jersey franchisees and (3) the out-of-state transactions have effects

within New Jersey. *Healy,* 491 U.S. at 336, 109 S.Ct. at 2499; *see also Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084.

The very argument of ISI underscores the point of a *per se* Commerce Clause violation. ISI argues:

> The legislative and public policy interest upon which the [Franchise Practices Act] is founded—the equalization of bargaining power between franchisees and franchisors—requires that the entire relationship between the parties, *not just that portion of the relationship that results in sales within New Jersey,* be governed by the Act's terms. By definition, *if its application is restricted to New Jersey sales,* the [Franchise Practices Act] cannot protect a New Jersey "hub-type" franchisee's investment in its multistate business from a franchisor's unfair termination of portions of the multistate territory which the franchisor granted to the franchisee in the parties' contract.

ISI Opp. Brief at 12 (emphasis added). While this argument may indeed be true, the point is that New Jersey cannot impose its law on other states by applying the Franchise Practices Act to sales that take place outside of New Jersey.[26] *Brown–Forman,* 476 U.S. at 581–83, 106 S.Ct. at 2085–86; *Baldwin,* 294 U.S. at 528, 55 S.Ct. at 503.

As a final point with regard to this argument by ISI, this case is indistinguishable from *Healy, Brown–Forman* and *Edgar.* In all of these cases, the statutes found to violate the Commerce Clause purported only to apply to transactions occurring within the state and involving protection of state residents. For instance, in both *Healy* and *Brown–Forman,* the statutes on their face regulated only the prices of in-state sales of alcohol. *Healy,* 491 U.S. at 326, 109 S.Ct. at 2494; *Brown–Forman,* 476 U.S. at 583, 106

---

**26.** This point is also missed by the Attorney General, who states:

> [I]t is not a matter of constitutional concern that the New Jersey Franchise Practices Act protects the franchisee not only with respect to that part of the franchise territory that geographically encompasses New Jersey, but with respect to the entirety of that territory, *including those parts outside of New Jersey.*

Attorney General Opp. Brief at 29. These positions are directly contrary to *Healy, Brown–Forman* and *Edgar,* which dictate that a state may not project its law into another state. *See supra* at pp. 842, 843–45. Thus, to the extent "hub-type" franchise relationships centered in New Jersey are to be protected, this protection is provided by the parties' contract; if the franchise is wrongfully terminated, contract and quasi-contract causes of action would apply.

S.Ct. at 2086. Nevertheless, the Supreme Court struck down these statutes because their practical effect was to regulate prices out-of-state. *Healy,* 491 U.S. at 338–39, 109 S.Ct. at 2500–01; *Brown–Forman,* 476 U.S. at 581–83, 106 S.Ct. at 2085–86. In *Edgar,* despite the fact that the statute purported to apply only to tender offers for Illinois target corporations, the statute was found to violate the Commerce Clause because it regulated the sale of stock outside of Illinois. 457 U.S. at 626, 640–43, 102 S.Ct. at 2632, 2639–41. There simply is no difference in this case. The argument that the Franchise Practices Act is narrowly drawn to regulate only New Jersey based franchise relationships is unavailing, given that the practical effect of the Act is to regulate sales that take place outside of New Jersey.

### b. Argument that Franchise Practices Act Does Not Regulate Commerce Outside of New Jersey

■ ISI argues that the Franchise Practices Act does not regulate commerce outside of New Jersey. According to ISI, *Healy, Brown–Forman* and *Edgar* stand for the proposition that "the rule of *per se* constitutional infirmity is limited to cases in which the enacting state lacks an interest in, or connection to, the commerce that it regulates." ISI Opp. Brief at 17. ISI then argues: "The [Franchise Practices Act]'s function is entirely different. By its own terms, it cannot apply to an out-of-state franchise, or to any other economic relationship occurring outside of this state." *Id.* at 17–18.

The distinction drawn by this argument does not exist. As discussed at length above, *see supra* at pp. 845–48, the Franchise Practices Act has the effect of regulating out-of-state economic relationships and sales by requiring the 1984 Agreement to remain in effect after expiration on its own terms. Because the Franchise Practices Act restricts

and prohibits the ability of CCC, an out-of-state franchisor, from selling its products or entering into new franchise relationships in the Eight States outside of New Jersey without judicial approval, it does regulate extra-territorial economic relationships.[27] This is more than clear from the injunction requested by ISI, which seeks to prohibit CCC from marketing its products in the Eight States in any way other than through ISI in accordance with the long-expired 1984 Agreement.

Again, there is no distinction between this case and *Healy, Brown–Forman* or *Edgar.* In each of these cases, the enacting state's only interest—and only justification—in regulating out-of-state businesses was to regulate in-state conduct and to protect its citizens from the in-state activities of out-of-state businesses. For instance, in *Healy* and *Brown–Forman,* Connecticut and New York sought only to regulate the price of beer and alcohol sold *within* their states. Similarly, in *Edgar,* Illinois sought to regulate only tender offers for target companies *within* the state.

The statutes in *Healy, Brown–Forman* and *Edgar* "by their own terms" could not apply to out-of-state pricing arrangements or to non-state-related target corporations. Nevertheless, because out-of-state conduct was effected by the relevant legislation, the statutes in *Healy, Brown–Forman* and *Edgar* were found to violate the Commerce Clause. Accordingly, it is irrelevant that, as argued by ISI, the Franchise Practices Act "by its terms" regulates only New Jersey franchise arrangements when the practical effect of the statute is to regulate non-New Jersey sales and franchise relationships. The Franchise Practices Act attempts to protect in-state interests by asserting control over out-of-state commercial relationships.[28] As ISI concedes in discussing *Healy,* such a situation violates the Commerce Clause. *See* ISI Opp. Brief at 18.

---

**27.** Like the New Jersey Supreme Court, ISI characterizes the effect of the Franchise Practices Act on interstate commerce as "incidental." As discussed above, however, there is no basis for this argument. *See supra* n. 20.

**28.** Even the Attorney General recognizes the parochial nature of the Franchise Practices Act. The Attorney General states:

[T]he statute is but one example of a broad and virtually endless array of regulatory provisions enacted *to protect state citizens and [the State's] economic and social well-being.*

Attorney General Opp. Brief at 18. This is precisely the kind of local protectionism when applied to out-of-state commercial transactions that has been found to violate the Commerce Clause.

In support of the position that the Franchise Practices Act does not regulate commerce outside of New Jersey, both ISI and the Attorney General cite two cases—*Mon–Shore Management, Inc. v. Family Media, Inc.*, 584 F.Supp. 186 (S.D.N.Y.1984) and *CSS–Wisconsin Office, etc. v. Houston Satellite Systems, Inc.*, 779 F.Supp. 979 (E.D.Wis. 1991). These cases, however, are distinguishable.

In *Mon–Shore Management*, the New York statute at issue required franchise sellers to register in New York and to provide full financial disclosure when an offer to sell originated, was extended or accepted in New York. 584 F.Supp. at 189. It was argued that this law, "insofar as it govern[ed] the offer and sale of franchises to out-of-state parties, constitute[d] a direct and excessive burden on interstate commerce." *Id.* at 190. The *Mon–Shore* court rejected this argument, finding that "[t]he New York statute cannot have any effect whatsoever on the nationwide marketing of franchises if the franchisor elects to conduct his activities outside of this State and with non-residents." *Id.* at 191.

The New York franchise act in *Mon–Shore* differs significantly from the New Jersey Franchise Practices Act. As discussed, by effectively extending a franchise agreement in perpetuity, the Franchise Practices Act has the effect of regulating transactions between non-New Jersey parties that occur entirely outside of New Jersey. *See supra* at pp. 845–48. In contrast, the New York franchise act in *Mon–Shore* was not implicated unless the transaction at issue—namely, the offering for sale of a franchise—occurred in or was consummated in New York. In other words, there was no danger in *Mon–Shore* of the New York law applying to a transaction wholly unrelated to the state, involving entirely non-New York parties.[29]

In *CSS–Wisconsin Office*, the court was faced with the question of whether, under choice-of-law principles, the Wisconsin Fair Dealership Law could apply to the dispute.

779 F.Supp. at 982. Rather than mounting a full-fledged Commerce Clause challenge, the defendant argued in passing that application of the Wisconsin law "to the present controversy may present difficulties under the [C]ommerce [C]lause." *Id.* at 986. Without engaging in any significant analysis, the court stated that "because the distributor relationship . . . . involves commerce that actually takes place in Wisconsin, the court is not persuaded that applying the Wisconsin Fair Dealership law to the distributor relationship would offend the commerce clause." *Id.*

Put simply, *CSS–Wisconsin* is not a persuasive authority. At best, the court's analysis is brief and does not discuss what, if any, extraterritorial effects would have resulted from the application of the Wisconsin statute to states outside of Wisconsin. Moreover, the central question in *CSS–Wisconsin* involved which law was to be properly applied in the case, meaning that the court was concerned with such questions as Wisconsin's interest in applying its law and the extent of the parties' contacts with the state.[30] As discussed, these considerations do not impact the analysis of *per se* Commerce Clause violations. Accordingly, to the extent *CSS–Wisconsin* may take a position contrary to this Opinion, its reasoning is rejected in light of the clear Supreme Court authority in *Healy*, *Brown–Forman* and *Edgar*.

### c. Argument That Franchise Practices Act Does Not Conflict With Other States' Law

▬ Although ISI concedes that numerous other states in the original Marketing Territory "do not regulate franchise relationships at all," *see* ISI Opp. Brief at 23 & n. 14, ISI argues that the Franchise Practices Act does not conflict with the regulation of those other states. ISI states:

[T]he franchisor is not required by the [Franchise Practices] Act to award a multistage territory to a New Jersey franchisee. Thus, the statute does not contradict

---

**29.** In addition, it is noted that *Mon–Shore* was decided prior to the Supreme Court's decisions in *Healy* and *Brown–Forman* and, therefore, lacked the benefit of these decisions.

**30.** This analysis is similar to the analysis conducted by the New Jersey Supreme Court. *See* 130 N.J. at 366–69, 614 A.2d 124. As discussed, *see supra* at n. 20, this analysis is not adopted.

or contravene the franchise regulation scheme of any of the states at issue.... ISI's entitlement to the [Franchise Practices] Act's protection over its agreed-upon multistage territory by New Jersey law will not preclude the enforcement of the franchising law of other affected states. Were it otherwise, choice of law governance of contractual relationships which have multistage manifestations would be meaningless.

*Id.* at 23–24.

This argument is without merit. As discussed, applying the New Jersey Franchise Practices Act in states without such regulation—on transactions between non-New Jersey entities occurring entirely outside of New Jersey—imposes restrictions on franchise regulation, if not formation, and on the selling of goods not otherwise present in those states. In states where CCC would otherwise be able to sell its products unimpaired, such as Maine, Maryland Massachusetts, New Hampshire, Rhode Island and Vermont, which ISI concedes have no franchise termination statutes, *see* ISI Opp. Brief at 23 n. 14, the Franchise Practices Act would preclude those sales. The imposition by New Jersey of the Franchise Practices Act restrictions interferes with the regulatory autonomy of these states, in violation of the Commerce Clause.

Contrary to ISI's suggestion, unconstitutional interference is present just as much in situations where states have chosen not to enact certain types of legislation, as where conflicting legislation has been enacted. For instance, in *Hyatt Corp. v. Hyatt Legal Servs.*, 610 F.Supp. 381 (N.D.Ill.1985), the court was faced with an analogous situation in which a plaintiff was seeking a nationwide injunction based upon Illinois' trademark anti-dilution statute. Analyzing the issue in the context of the Supreme Court's Commerce Clause jurisprudence, the *Hyatt* court refused to issue a nationwide injunction and stated:

The rights accorded plaintiff by Illinois are not of a nature commonly recognized elsewhere. Whether or not to extend protection in the absence of any likelihood of confusion is customarily a legislative policy

decision. Though a number of states have anti-dilution statutes ... a majority do not. *Imposing Illinois' anti-dilution law upon those states that have chosen not to pass such a law, in some cases possibly by explicit choice ... is an anathema to our federal system.*

610 F.Supp. at 385 (citing *Blue Ribbon Feed Co. v. Farmers Union Central Ex., Inc.,* 731 F.2d 415, 422 (7th Cir.1984)).

The same issues are present with regard to the Franchise Practices Act. Accordingly, because extraterritorial enforcement of the statute would impose rights and restrictions granted by New Jersey that do not exist in most of the states within the Marketing Territory, the Commerce Clause—as well as the notions of state autonomy and comity which support the Commerce Clause—dictate that the Franchise Practices Act not be given extraterritorial application. New Jersey cannot impose its regulation or policy choices on other states. *See Wright–Moore Corp. v. Ricoh Corp.,* 794 F.Supp. 844, 860–61 (N.D.Ind.1991) (refusing to give Indiana Deceptive Franchise Practices Act extraterritorial application, recognizing that "[c]learly, other states' legislatures can give protection to franchises within the states' borders if they so wish" and that "giving Indiana's franchise statute extraterritorial effect raises Commerce Clause issues"), *aff'd,* 980 F.2d 432 (7th Cir.1992).

*d. Argument That Franchise Practices Act Regulates Even–Handedly and Does Not Discriminate Between New Jersey and Non–New Jersey Franchisees*

▮ The Attorney General, and to a limited degree ISI, argue that the Franchise Practices Act does not *per se* violate the Commerce Clause because it does not discriminate between New Jersey and non-New Jersey franchisors. *See* Attorney General Opp. Brief at 5, 9; *see also* ISI Opp. Brief at 35–36 (making same argument). The Attorney General states:

The law of the Commerce Clause is that a *per se* standard is not to be applied unless a statute is discriminatory against out-of-state interests on its face or in its obvious purpose or effect against interstate com-

merce; the New Jersey Franchise Practices Act plainly does none of these.

Attorney General Opp. Brief at 5. The Attorney General also states:

> As long as the state statutory scheme does not compel out-of-state residents to bear the brunt of the scheme for no reason other than that they live and vote in other states, and as long as nothing in the statute or its history indicates a discriminatory purpose, the statute will readily survive under the *per se* standard.

*Id.* at 9.

Although it appears the Franchise Practices Act applies equally to in-state and out-of-state franchisors, this argument simply misstates the law which forms the basis finding that the Franchise Practices Act *per se* violates the Commerce Clause. As the Supreme Court has stated repeatedly, a statute is *per se* unconstitutional when it *"directly regulates or* discriminates against interstate commerce." *Healy,* 491 U.S. at 337 n. 14, 109 S.Ct. at 2499 n. 14 (emphasis added); *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084. In other words, the *per se* rule is not confined to laws which discriminate against interstate commerce; it includes, as well, those laws that "directly regulate" transactions occurring entirely out-of-state. *See Beyer Farms, Inc. v. Brown,* 721 F.Supp. 644, 647 (D.N.J.1989) (recognizing that direct regulation of interstate commerce and discrimination are separate violations of Commerce Clause).

That this argument lacks merit is evident from the analytical framework of the Supreme Court's decision in *Healy.* The *Healy* Court, in analyzing the Connecticut price-posting statute, first determined that the statute violated the Commerce Clause because it had "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State." 491 U.S. at 337, 109 S.Ct. at 2500. Then, in an entirely separate section of the opinion, the *Healy* Court recognized: "The Connecticut statute, moreover, violates the Commerce Clause in a *second respect:* On its face, the statute discriminates against brewers and shippers engaged in interstate commerce." *Id.* at 340, 109 S.Ct. at 2501 (emphasis added). Thus, in

*Healy,* the Supreme Court found direct regulation and discrimination to be separate, equally-viable bases for striking down statutes under the Commerce Clause.

Courts have often recognized that a statute can violate the Commerce Clause without having a discriminatory effect. In *Brown–Forman,* for instance, the Supreme Court struck down the New York price-posting statute, even though it was conceded that the statute even-handedly regulated in-state and out-of-state distillers, on the ground that New York had "projected its legislation into other states, and directly regulated commerce therein." 476 U.S. at 579, 582–84, 106 S.Ct. at 2084, 2086–87; *see also Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envt'l Prot.,* 965 F.2d 1287, 1293 (3d Cir.) (recognizing that "[t]he Supreme Court has invalidated state statutes where a state has 'projected' its legislation into other states and directly regulated commerce therein"), *cert. denied,* —— U.S. ——, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992).

Accordingly, because the Franchise Practices Act *directly* regulates interstate commerce—and particularly transactions between non-New Jersey residents occurring entirely outside of New Jersey—it is *per se* violative of the Commerce Clause despite the absence of any discriminatory purpose or effect.

*e. Argument That Franchise Practices Act Does Not Violate Commerce Clause Because This Is an "Atypical" Situation*

 The Attorney General argues:

> In the vast run of situations there is *no* burden whatever [on interstate commerce], since undoubtedly most franchise arrangements concern business operations solely within New Jersey.

Attorney General Opp. Brief at 28.

This argument is without merit. As an initial matter, the Attorney General misconstrues CCC's position. As noted, *see supra* n. 21, CCC does "not question New Jersey's power to protect in-state franchises insofar as their distribution activities within New Jersey are concerned," Moving Brief at 20 (emphasis omitted), nor does CCC "dispute that New Jersey may apply the [Franchise

Practices Act] to distribution activities within its border. Secondary Reply Brief at 2. Instead, CCC only challenges the Franchise Practices Act "insofar as it has been construed to apply to CCC's distribution activities in other states." Secondary Reply Brief at 2.

More significantly, however, the Attorney General has cited no authority to support the proposition that a state may regulate commerce that occurs entirely outside its borders, so long as it only does so in "atypical" situations. The rule of law is simple and unequivocal: A state statute that has the practical effect of regulating conduct wholly outside of its borders "exceeds the inherent limits of the enacting state's authority" and *per se* violates the Commerce Clause. *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499; *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084; *Edgar*, 457 U.S. at 642–43, 102 S.Ct. at 2640–41.

That the majority of franchise arrangements may operate solely inside of New Jersey is irrelevant because the Franchise Practices Act will have the same extraterritorial effect in *every case* that concerns multi-state franchise arrangements and a non-New Jersey franchisor. Thus, even if multi-state arrangements can be characterized as atypical,[31] the consistency with which the Franchise Practices Act will, in such situations, have the effect of regulating transactions wholly outside of New Jersey between non-New Jersey parties brings the statute within the *per se* prohibition of the Commerce Clause. *See Motor Vehicle Mfrs. Ass'n v. Abrams*, 720 F.Supp. 284, 288 (S.D.N.Y.1989) (recognizing that "innocuous" as a statutory requirement on out-of-state franchises may be, such requirements have the "effect of regulating commerce in other states in violation of the Commerce Clause") (citations omitted).

*f. Argument That CCC Cannot Use the Commerce Clause to Re–Write Its Contract With ISI*

■ Finally, it is argued that CCC is attempting to use the Commerce Clause as a means for re-writing its contract with ISI. For instance, the Attorney General states:

> [N]o one forced CCC to grant ISI a multi-state territory. The Franchise Practices Act had been in effect for more than a decade before the 1984 [A]greement, and CCC therefore must be presumed to have been aware of its requirements. It could have avoided its present difficulties simply by granting ISI a franchise territory covering New Jersey and nothing more, yet it did not do so. CCC cannot now use the Commerce Clause as the guise for having this [c]ourt rewrite its own contract.

Attorney General Opp. Brief at 30; *see also* ISI Opp. Brief at 30–31 (making same argument).

This argument too is without merit. Contrary to the above suggestion, this is not a case in which CCC is attempting to terminate a contract prematurely. As expressly stated in the 1984 Agreement and agreed-upon by the parties, the 1984 Agreement expired on 31 July 1989. Upon expiration, CCC determined that it would not renew its re-seller arrangement with ISI on the same terms as before. In fact, as mentioned, the 1984 Agreement contains *no* provision requiring renewal beyond the expiration date of the contract, let alone renewal on identical terms.

It is disingenuous to argue that CCC is attempting to have the court re-write its contract with ISI when that very contract provided for application of California law and by its terms expired almost four years ago. To the extent the terms of the 1984 Agreement continue to apply to the CCC/ISI relationship, they do so only because the Franchise Practices Act requires the contract to continue in perpetuity until CCC can demonstrate that "good cause" exists for its failure to renew the 1984 Agreement in its entirety. Thus, as CCC accurately re-states the issue, what it seeks to prevent is not the operation

---

**31.** The Attorney General has provided no support—factual or otherwise—for the contention that multi-state franchises based in New Jersey are atypical. In fact, even ISI recognizes that New Jersey is "centrally located" and, given its "strategic position," provides an effective base "to service an extensive territory." ISI Opp. Brief at 4.

of its contract with ISI, but rather "the State of New Jersey from superseding the contract to give ISI what may amount to a perpetual and exclusive right to distribute CCC's products in [the Eight States]."[32] Secondary Reply Brief at 3.

*Conclusion*

For the reasons set forth above, the motion for partial summary judgment is granted. Extraterritorial application of Franchise Practices Act constitutes a *per se* violation of the Commerce Clause. Accordingly, Count One of the Complaint is dismissed with prejudice, insofar as it alleges that CCC violated the Franchise Practices Act by not renewing the 1984 Agreement, with respect to Connecticut, Delaware, the District of Columbia, Maine, Maryland, New Hampshire, Rhode Island and Vermont.

---

**32.** The suggestion that CCC was aware of the Franchise Practices Act at the time it entered into its contract with ISI ignores that facts that (1) the parties agreed that California, not New Jersey, law would govern the contract and (2) New Jersey has historically given effect to contractual choice-of-law clauses. *See, e.g., Instructional Systems*, 130 N.J. at 341, 614 A.2d 124; *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 N.J.Super 666, 671–72, 506 A.2d 817 (App. Div.1986); *Kalman Floor Co. v. Jos. L. Musca-relle, Inc.*, 196 N.J.Super 16, 21–22, 481 A.2d 553 (App.Div.1984), *aff'd*, 98 N.J. 266, 486 A.2d 334 (1985). *But see Instructional Systems*, 130 N.J. at 341–46, 367, 614 A.2d 124 (finding that, although "nothing indicates that CCC intended or agreed that New Jersey law would cover its activities in the sister states of New Jersey," New Jersey had sufficient interest to apply its law to 1984 Agreement and to supersede contractually agreed-upon choice-of-law-clause).